**PLANTATION PATTERNS, INCORPO-RATED, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent-Appellee.**

**John S. JEMISON, Jr. and Marie S. Jemison, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent-Appellee.**

**No. 31126.**

United States Court of Appeals, Fifth Circuit.

June 15, 1972.

Rehearing Denied July 6, 1972.

Wm. Bew White, Jr., Birmingham, Ala., Ivins, Phillips & Barker, Washington, D. C., Griffith F. Pitcher, Karl R. Price, Birmingham, Ala., Bradley, Arant, Rose & White, Birmingham, Ala., of counsel, for petitioners-appellants.

Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, Washington, D. C., K. Martin Worthy, Chief Counsel, Eugene F. Collella, Atty., Int. Revenue Serv., Washington, D. C., Ernest J. Brown, Carolyn R. Just, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before JONES, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

This is an appeal from a determination by the Tax Court of tax deficiencies against the corporate taxpayer, Plantation Patterns, Incorporated (New Plantation hereinafter, to distinguish it from an earlier corporation with the same name) for the fiscal years ending September 30, 1963–65, for the respective amounts of $2,947.12, $51,719.69, and $23,732.28, and against the individual taxpayers, John S. Jemison, Jr. (Mr. Jemison) and his wife, Marie S. Jemison (Mrs. Jemison) of $28,403.91 for their taxable year 1963.[1] The cases were consolidated for trial in the Tax Court as they are for purposes of this appeal.

## I.  THE FACTS

Most of the relevant facts are stipulated. The New Plantation, an Alabama corporation, filed income tax returns, on the accrual basis, for its taxable years ended September 30, 1963 through September 30, 1965, with the office of the District Director of Internal Revenue, Birmingham, Alabama. The individual taxpayers also filed their joint income tax return for their taxable year ended December 31, 1963, with the Birmingham District Director at Birmingham.

New Plantation's corporate predecessor, which was also called Plantation Patterns, Inc. (Old Plantation) was engaged in the business of manufacturing wrought iron furniture in Birmingham, Alabama, from the time of its incorporation in 1956 until September 23, 1962.

Prior to September 28, 1962, the stockholders of Old Plantation and the outstanding shares therein were owned as follows:

|  | Number of Shares |
|---|---|
| Thomas E. Jernigan | 162,483 |
| William C. Jernigan | 80,718 |
| John M. Goodwin | 8,812 |
| H. Ferrell Jernigan | 353 |
| James C. Stone | 17,624 |
| Total | 270,000 |

Before that date Mr. Thomas E. Jernigan was president and Mr. William C. Jernigan was vice president and secretary of Old Plantation.

During the spring of 1962, Old Plantation made plans for a public offering of 100,000 shares of its common stock in order to raise funds to develop the United Chair Division and to permit Old Plantation to operate both the wrought iron furniture business and the United Chair Division's metal office chair business. This public offering was not con-

---

1. The memorandum findings of fact and opinion of the Tax Court is reported at P-H Memo T.C. par. 70,182 (1970). Jurisdiction is conferred on this Court by Section 7482 of the Internal Revenue Code of 1954.

summated. Messrs. Thomas E. and William C. Jernigan then decided that it would be in their best interests to sell the wrought iron furniture business of Old Plantation and to develop the United Chair Division's metal office chair business.

During the summer of 1962, the shareholders of Old Plantation decided that they would attempt to sell their interests in both the wrought iron furniture and metal office chair businesses by sale of their Old Plantation stock. In July of 1962, Mr. Jack Parish, a member of the accounting firm that had worked on the prospectus for the proposed public offering of Old Plantation stock, contacted Mr. John S. Jemison, Jr., the president and controlling shareholder of Jemison Investment Co., Inc., and inquired if he would be interested in purchasing or finding a purchaser for the stock of Old Plantation.

At that time Mr. Jemison was an experienced investment banker, having been in that business for at least twenty years. As an investment banker, he had arranged for the acquisition of businesses, both for Jemison Investment Co., Inc. clients and for its own account— both as purchases of assets and as purchases of stock. Mr. Jemison had become a member of the board of directors of a number of corporations.

Jemison Investment Co., Inc. had acted as agent or broker for purchasers and sellers of businesses since its organization by Mr. Jemison in 1949. During 1962, Jemison Investment Co., Inc. had assets of eleven million dollars, including a number of wholly owned subsidiaries, such as a transit company that operated the city bus system in Birmingham, Alabama, a company that manufactured window frames in Chicago, Illinois and operated a textile mill in North Carolina, and corporations that operated department stores in St. Petersburg, Florida, and Tuscaloosa, Alabama.

The accountant Parish arranged for negotiations in July and August, 1962, between Messrs. Jemison and Thomas E. Jernigan concerning the sale of Old Plantation. These negotiations led to a general understanding between Messrs. Jemison and Thomas E. Jernigan that a corporation would be formed to purchase all the stock of Old Plantation and that Old Plantation would sell its United Chair Division's metal office chair business to Messrs. Thomas E. and William C. Jernigan.

A letter addressed to Mr. Thomas E. Jernigan dated August 24, 1962, on the letterhead of Jemison Investment Co., Inc. and signed by Mr. Jemison, set forth a conditional offer to purchase the "assets of the Plantation Patterns Division". This letter stated:

"We would organize a new corporation to be known as Plantation Patterns Corporation (it is understood that you would agree to change the name of the existing corporation) and we would pay in a total of $155,000. in cash—$150,000. in 6½% subordinated notes—which notes would be subordinated to your notes—and $5,000. in common stock."

On September 25, 1962, Mr. Jemison caused New Plantation to be organized under the laws of the State of Alabama. Upon its incorporation, New Plantation issued ten shares of common stock with a par value of $100 per share to its incorporators. On the same date that it was incorporated, the incorporators transferred those ten shares of stock to Mrs. Marie S. Jemison.

On September 26, 1962, New Plantation issued an additional 40 shares of common stock to Mrs. Jemison for a price of $4,000 cash. Mrs. Jemison paid for this additional 40 shares and her initial ten shares of stock by her check for $5,000 dated September 26, 1962. The record does not indicate whether or not the funds for the purchase of the stock came from the separate estate of Mrs. Jemison. The total capital stock of New Plantation, consisting of the 50 shares of common stock held by Mrs. Jemison, remained at $5,000 through September 30, 1966.

Mrs. Jemison took no active part in the preliminary negotiations leading up

to the incorporation of New Plantation on September 25, 1962, in any of the events that took place thereafter, or in the management of New Plantation from the time it was incorporated to September 30, 1966, inclusive. Mrs. Jemison, her husband and Mr. Thomas Bradford were the directors of New Plantation. A meeting of the directors and a joint meeting of the directors and stockholders of New Plantation took place on September 28, 1962. Although Mrs. Jemison was the sole shareholder of record and a director, she attended neither meeting. Mr. Jemison was active in the management of New Plantation. Mr. Jemison testified that he had contacts with large department stores that sold wrought iron furniture.

On September 27, 1962, New Plantation obtained $150,000 from Bradford and Company, Inc., an unrelated finance and investment company, for which it issued 6½% serial debentures aggregating $150,000 maturing in $50,000 units on September 1, 1974, 1975, and 1976. The debentures were subordinated to all other indebtedness of New Plantation and were not guaranteed as to payment of either principal or interest. Mr. Thomas Bradford controlled Bradford and Company. The loan by Bradford and Company was made as an inducement to Mr. Jemison to place Mr. Bradford's son with New Plantation. Although this advance was made with little security and no priority as to repayment, the Tax Court found that it was a bona fide loan.

The sellers accepted, with modifications, the proposal made in the Jemison letter of August 24, 1962, and the terms of sale were embodied in an agreement dated September 28, 1962 between New Plantation and the stockholders of Old Plantation. Pursuant to that agreement, the stockholders agreed to sell and New Plantation agreed to buy the stock of Old Plantation for a stated consideration equal to the net worth of Old Plantation plus $644,909.53. The total purchase price was to be paid as follows:

(1) A cash payment of $100,000 at the time of closing;

(2) An amount equal to the book value of the United Chair Division ($183,435.84), without interest, in installments on January 10, 1963, March 15, 1963 and June 15, 1963;[2] and

(3) The balance ($609,878.33) in equal installments of $50,000 beginning October 1, 1963, and each year thereafter, with a final installment of $109,878.33 due on October 1, 1973. The notes representing such installments were to be guaranteed by the Jemison Investment Company and by Mr. Jemison, personally.

Pursuant to the agreement of September 28, 1962 Mr. Thomas E. Jernigan agreed to serve as president and chief executive officer of New Plantation for two years beginning October 1, 1962.

Further pursuant to the agreement of September 28, 1962, the stockholders of Old Plantation transferred their stock to New Plantation for a stated consideration of $893,314.17, of which $100,000 was paid in cash at the time of the sale, and the balance of $793,314.17 was payable in installments—three totaling $183,435.84 in 1963, with no interest; and $609,878.33 at 5½% interest, payable in ten annual installments of $50,000 each on October 1 of 1963 through 1972, and a final installment on October 1, 1973, of $109,878.33.

New Plantation issued 15 non-interest-bearing notes aggregating $183,435.84 to evidence the payments due January 10, 1963, March 15, 1963 and June 15, 1963. These notes were not guaranteed and the *indebtedness was subordinated to all other indebtedness of New Plantation except the* $150,000 owed to Bradford and Company.[3] The parties who

2. In turn, Messrs. Thomas E. Jernigan and William C. Jernigan agreed to purchase the assets of the United Chair Division for the same amount payable on the same terms.

3. The Commissioner conceded that the principal payments on these non-interest-bearing notes did not result in dividend income to the Jemisons.

negotiated the agreement intended that payment of these notes would be effected through the sale by Old Plantation of its United Chair Division's metal office chair business to Messrs. Thomas E. and William C. Jernigan.

New Plantation also issued fifty-five 5½% serial notes aggregating $609,-878.33 to evidence the remaining payments due on account of the purchase of the stock. These notes were guaranteed absolutely as to principal and interest by Mr. Jemison individually and by the Jemison Investment Co., Inc. Jemison Investment Co., Inc. received a guarantee fee of $15,000 per year for its guarantee. Mr. Jemison did not receive any fee for his guarantee. The guarantees were required due to the small down payment made on the purchase and the requirement that the debt be unsecured to enable New Plantation to obtain financing for its operations.

The notes for $50,000 due October 1, 1963 and $50,000 due October 1, 1964 were not subordinated so that Mr. Jemison could arrange for the sellers to discount these notes with a bank. This enabled Messrs. Thomas E. and William C. Jernigan to obtain additional capital for development of the office chair business. The remaining notes were subordinated to all other indebtedness except the 6½% serial debentures issued to Bradford and Company.

Pursuant to another agreement dated September 28, 1962, Old Plantation agreed to sell the assets of its United Chair Division to Messrs. Thomas E. and William C. Jernigan, effective as of the close of business on August 31, 1962. In consideration for that sale, Messrs. Thomas E. and William C. Jernigan agreed to pay to Old Plantation the sum of $183,-435.84. In its final return Old Plantation reported that its basis in the assets of the United Chair Division equaled the proceeds received on that sale.

As of September 28, 1962, Old Plantation was liquidated. Its assets were transferred to and its liabilities were assumed by New Plantation.[4] Following the liquidation of Old Plantation, the business and assets of the United Chair Division were immediately transferred to Messrs. Thomas E. and William C. Jernigan, who issued to New Plantation a non-interest-bearing promissory note dated September 28, 1962 in the principal amount of $183,435.84 payable as follows:

| Due Date | Amount |
|---|---|
| October 8, 1962 | $ 83.435.84 |
| March 15, 1963 | 50,000.00 |
| June 15, 1963 | 50,000.00 |
| Total | $183,435.84 |

The Messrs. Jernigan duly made the payments on this note on or before the due date, while New Plantation similarly paid the non-interest-bearing notes aggregating $183,435.84 due January 10, 1963, March 14, 1963 and June 14, 1963. As a result, the United Chair Division was acquired by Messrs. Thomas E. and William C. Jernigan through an exchange or offset of notes.

During the period from October 1, 1962 to September 30, 1966, New Plantation duly paid principal and interest as due on the 6½% debentures issued to Bradford and Company and on the 5½% notes issued to the stockholders of Old Plantation. The payments were made by New Plantation without recourse to any additional financing.

During its four taxable years ended September 30, 1963 through September 30, 1966, New Plantation accrued $117,-652.65 interest expense on the 5½% serial notes issued to the shareholders of Old Plantation, and $39,000 on the 6½% debentures issued to Bradford and Company, which amounts it deducted on its tax returns filed for those years as the Tax Court noted in its findings of fact.

4. The Commissioner contended in the Tax Court that the fair market of the inventory among the tangible assets received by New Plantation was $184,936.04 as shown on its returns. The Tax Court held that the fair market value of the inventory was $228,376.12. The Commissioner has not appealed from that determination.

In the notice of deficiency sent to New Plantation for is taxable years ended September 30, 1963 through September 30, 1966, inclusive, the Commissioner disallowed as an expense the deductions claimed by New Plantation for such interest.[5]

In its return for the period September 25 to September 30, 1962, New Plantation reported assets received (according to a computation of the adjusted basis of its stock on September 28, 1962, and the allocation of that adjusted basis to the assets received in liquidation from Old Plantation, as shown in the Tax Court's findings) and liabilities assumed on the liquidation of Old Plantation.

The sum of $184,936.04 shown as the fair market value of the inventory in the schedules included by New Plantation in its return represented the book value of the inventory of Old Plantation computed as the lower of average cost or market. The Tax Court determined that the fair market value of the inventory received by New Plantation on the liquidation was $228,376.12 (Note 4, supra) and that New Plantation otherwise properly valued the tangible assets on the liquidation.[6]

5. The Commissioner conceded in the Tax Court that New Plantation was entitled ton an expense deduction for the $39,000 interest paid on the 6½% debentures issued to Bradford and Company.

6. Thus on September 30, 1962, New Plantation's balance sheet looked like this:

| ASSETS | | VALUES |
|---|---|---|
| Cash | | $    54,038.26 |
| Accounts receivable-trade | $36,570.71 | |
| Allowance for bad debts | 3,000.00 | 33,570.71 |
| Accounts receivable-other | | 229,050.25 |
| Inventories | | 228,376.12 |
| Prepaid expenses | | 24,901.80 |
| Employees' advance | | 1,705.66 |
| Travel advance | | 500.00 |
| Machinery and equipment | | 391,028.50 |
| Truck | | 525.00 |
| Office equipment | | 18,733.00 |
| Leasehold improvements | | 37,374.50 |
| Goodwill | | 199,060.70 |
| Long-term lease | | 42,463.31 |
| | | $1,261,327.81 |

| LIABILITIES | | |
|---|---|---|
| Notes payable-current installments | | $   221,446.00 |
| Due to factor | | 83,362.83 |
| Accounts payable-trade | | 55,279.89 |
| Accrued salaries, wages and commissions | | 8,329.80 |
| Accrued payroll taxes and taxes withheld from employees | | 12,840.46 |
| Accrued bonus and vacation pay | | 12,822.44 |
| Accounts payable to former stockholders | | 4,708,62 |
| Accrued state and local taxes | | 3,079.39 |
| Federal and state taxes on income | | 92,383.11 |
| Long term debt | | |
| Unsubordinated 5½% notes | $100,000.00 | |
| Partially subordinated 5½% notes | 509,878.33 | |
| Fully subordinated 6½% debentures | 150,000.00 | |
| Other notes payable | 2,196.94 | |
| | | $   762,075.27 |
| Common stock | | 5,000.00 |
| | | $1,261,327.81 |

In the notice of deficiency addressed to Mr. and Mrs. Jemison for the calendar year 1963, the Commissioner determined that the individual taxpayers realized dividends in the amount of $184,-274.23 on account of the following payments by Old Plantation:

| | |
|---|---:|
| Payment of non-interest-bearing note due 3/14/63 | $ 50,000.00 |
| Payment of non-interest-bearing note due 6/15/63 | 50,000.00 |
| Payment of 5½% note due 10/1/63 | 50,000.00 |
| Payment of interest on 5½% note due 10/1/63 | 33,543.31 |
| Payment on account of 5½% note of minority stockholder on 10/24/63 | 730.92 |
| Total | $184,274.23 |

The Tax Court held that all steps taken by Mr. Jemison and the shareholders of Old Plantation were parts of a single transaction for the purchase by New Plantation of the wrought iron furniture business of Old Plantation, and, applying the relevant factors with respect to debt-equity situations to the facts here, one of which was found to be thin capitalization, that the guaranteed debt must be treated as an indirect contribution to New Plantation's capital by Mr. Jemison. Therefore, it held that New Plantation was not entitled to deductions claimed under Code Section 163 for interest on the 5½% serial notes in its taxable years ended September 30, 1963 to September 30, 1966 and that the Jemisons were taxable in 1963 under Code Sections 301 and 316 with the principal and interest payments on these guaranteed notes in that year.[7] Their deficiency was fixed at $28,403.91.

## II. THE ISSUES ON APPEAL

The issues presented for our consideration are these:

1. Whether $100,000 of guaranteed 5½% serial debentures issued by New Plantation to the sellers of Old Plantation are to be treated as debt for income tax purposes where the notes were not subordinated and were paid when due by New Plantation without recourse to other financing?

2. Whether $509,878.33 of guaranteed 5½% notes issued by New Plantation to the sellers of Old Plantation are to be treated as debt for income tax purposes where the notes were subordinated to general creditors but were senior to $150,000 of other debentures which the Tax Court did treat as debt for income tax purposes?

3. Whether Jemison Investment Company, a co-guarantor, rather than John S. Jemison, Jr., a co-guarantor, should be deemed to have made the contribution to the equity capital of New Plantation in the event that any of the $609,878.33 principal amount of 5½% notes is deemed to represent a contribution to the equity capital of New Plantation?

## III. THE RELEVANT LAW

The criteria for adjudicating debt-equity cases were set forth most clearly by Judge Jones for this Court in 1963 in Montclair, Inc. v. C. I. R., 5 Cir., 1963, 318 F.2d 38. At page 40 of Volume 318 F.2d the factors which bear most strongly on the determination of the label to be applied to the transaction are enunciated:

"(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the

---

7. The Tax Court allowed the Jemisons a deduction for interest paid the sellers by New Plantation.

ability of the corporation to obtain loans from outside lending institutions." [8]

Since *Montclair, Inc.* consideration of debt-equity cases has frequently demanded the attention of this Court. See, e. g., In re Indian Lake Estates, Inc., Bankrupt, 5 Cir. 1971, 448 F.2d 574, 577; Dillin v. United States, 5 Cir. 1970, 433 F.2d 1097; Tyler v. Tomlinson, 5 Cir. 1969, 414 F.2d 844; Berkowitz v. United States, 5 Cir. 1969, 411 F.2d 818; Harlan et al. v. United States, 5 Cir. 1969, 409 F.2d 904; Tomlinson v. 1661 Corporation, 5 Cir. 1967, 377 F.2d 291; United States v. Henderson, 5 Cir. 1967, 375 F.2d 36. In applying these factors, each case must be decided on its own facts, and no one standard is controlling. See generally the cases just cited, supra. The tests are not "talismans of magical power", and the most that can be said is that they are a source of helpful guidance. Tyler v. Tomlinson, supra. Thus we decide debt-equity issues by a case by case analysis, applying the *Montclair* rubrics as best we can to the facts at hand.

## IV. TREATMENT OF THE $100,000 UNSUBORDINATED 5½% DEBENTURES AND THE $509,878.33 PARTIALLY SUBORDINATED 5½% NOTES

With regard to the $100,000 unsubordinated debentures, the taxpayers urge us to reverse the Tax Court for the following reasons: (1) There was a reasonable prospect of payment when due, (2) the notes were not subordinated to any other indebtedness of New Plantation, (3) the holders, along with general creditors, had first claim on more than $1,000,000 in assets of New Plantation, (4) the notes matured within two years, (5) the notes could have been paid by New Plantation's cash flow, and (6) the

notes were paid when due without recourse to additional financing.

Of these factors, taxpayers point first and foremost to the fact that the debentures were totally unsubordinated, and thus conferred on the holders the right to participate with general creditors. They further call to our attention that under the Code of Alabama had the creditors paid the notes their subrogation rights would have permitted them to participate in any insolvency proceeding as a general creditor. Section 87, Title 9, Code of Alabama of 1940, as amended.

Taxpayers also vigorously assert that the assets of the corporation were more than adequate to support the $100,000 unsubordinated notes because on September 30, 1962, New Plantation's assets had a fair market value of $1,261,327.81, Note 6, supra. Central to this appeal is the taxpayers' contention that the Tax Court erroneously concluded that New Plantation was thinly capitalized.

Additionally, with regard to the $100,000 of unsubordinated 5½% debentures, taxpayers emphasize that they were to mature within two years, a factor militating strongly against a conclusion that the money was put "at the risk" of the business. Bolstering this point, taxpayers state that the cash flow from depreciation in 1963 and 1964, the years of payment of the $100,000 notes, exceeded the principal payments of $50,000 due on the notes. They say that in view of the fact that the interest on the notes is deducted in determining net income, it was not necessary for New Plantation to have net income to pay these notes, and thus their repayment was not contingent on the profitability of the business.

Finally, the taxpayers criticize the Tax Court for not giving greater weight in assessing the economic realities of the situation to the fact that the notes were paid on time. Taxpayers claim that giv-

---

8. This delineation was not intended to prevent the consideration of other factors which may be relevant in a particular case. See Dillin v. United States, 5 Cir. 1970, 433 F.2d 1097 at footnote 3, page 1100.

ing this development its proper weight will lead us to the conclusion that the Tax Court was clearly erroneous in its holding that when the notes were issued there was no reasonable expectation that New Plantation could pay the notes. In this regard taxpayers also insist that the Tax Court gave undue emphasis to the overall debt-equity ratio, which they assert bears slight relevance to the determination of the treatment given unsubordinated notes. Taxpayers argue that whether a corporation can pay *all* of its debts is irrelevant to the question whether it can pay its priority debts.

Turning to the remaining $509,878.-33 of partially subordinated 5½% serial debentures, the taxpayers argue five points in support of their proposition that the Tax Court erred: (1) There was reasonable prospect of payment when due, (2) the notes, though partially subordinated, were senior to $150,-000 of 6½% debentures and $5,000 of common stock, (3) the assets of New Plantation were sufficient to support the debt, (4) the cash flow was sufficient to pay the debt, and (5) the notes were paid when due without recourse to additional financing.

Many of the arguments made by the taxpayers in favor of debt treatment for the $100,000 unsubordinated debentures are equally applicable for the remaining $509,878.33 of partially subordinated notes, and the taxpayers have urged us to accord them equal vitality here. New arguments also are raised at this juncture, however. Taxpayers contend that it is anomalous and inconsistent for the Tax Court to characterize the $509,878.-33 partially subordinated debentures as equity while at the same time characterizing inferior fully subordinated debentures held by Bradford and Company as debt, arguing that if the fully subordinated 6½% notes held by Bradford and Company are equity, surely the $509,-878.33 debentures are entitled to the same treatment.

Here the taxpayers protest vigorously against the Tax Court's determination of

the proper debt-equity ratio to apply in assessing the nature of the transaction. The principal dispute with the Tax Court revolves about that Court's valuation of the intangible assets of New Plantation, with particular emphasis on the personal business skills of Mr. Jemison. The Tax Court did recognize that intangible assets not carried on the balance sheet might have a bearing on the ability of the corporation to pay its debts. Murphy Logging Company v. United States, 9 Cir. 1967, 378 F.2d 222. But the Tax Court held that the relationship of Mr. Jemison's business skills to the well-being of New Plantation was not demonstrated with the specificity requisite to alter the picture of the overall debt-paying potential of New Plantation. Relying heavily on *Murphy Logging*, supra, the taxpayers contend that the record amply demonstrates that Mr. Jemison was a veritable financial genius, commanding Jemison Investment Company, a company with control of assets valued at more than $11,000,000 and with annual gross receipts of over $10,-000,000. They point to the record as reflecting that Mr. Jemison was successfully engaged in a broad variety of business ventures. He was a director of several successful corporations, a bank, and two insurance companies. More important, however, taxpayers assert, is Mr. Jemison's demonstrated close contact with several large department store chains which provided ideal outlets for New Plantation's products. Taxpayer on this account urges that a proper debt-equity ratio should take into account the financial skills of Mr. Jemison.

Without receding from their strong stand that the 5½% debentures constitute debt, the taxpayers alternatively argue that if the court should hold that such notes do not constitute debt, the same equity treatment should be given to the 6½% subordinated debentures held by Bradford and Company. Stated otherwise, they argue that if the 5½% *partially* subordinated debentures are to be regarded as equity, then the 6½% totally subordinated debentures should

logically be deemed to constitute preferred stock in New Plantation. Taxpayers point out that long-term debt held by non-stockholders has been held to be an equity interest in the nature of preferred stock. Foresun, Inc. v. Commissioner of Internal Revenue, 6 Cir. 1965, 348 F.2d 1006, affirming 41 T.C. 706 (1964). Taxpayers claim that they were denied the right to further trial on this point in the Tax Court, and they contend that at the very least this Court should remand the case to the Tax Court to permit development of further evidence as to the treatment to be given the $150,000 in Bradford and Company notes. If these notes are regarded as equity, taxpayers argue that the debt-equity ratio of New Plantation would be approximately 4 to 1 ($609,878.33 to $155,000), and not the plus 125 to 1 ratio which the government asserts is the proper debt-equity ratio ($759,878.33 to $5,000). This would effectively demolish the Tax Court finding of thin capitalization.

The Commissioner answers these contentions with the familiar tax law precept: substance and not form determines proper tax treatment for a transaction, urging that the substance of this transaction is that a corporation was sold for a price more than $600,000 in excess of its net worth, with payment promised by a new corporation without significant capital or other assets, whose only solidarity was the guarantee of the individual taxpayer, Mr. Jemison. The Commissioner continues that the guarantee was in reality a contribution of capital and that in substance the payments on the notes were dividends on the Jemison capital investment taxable to them as income.

More specifically the Commissioner places primary emphasis on the Tax Court's findings that the assets of the new corporation vis a vis its debts were insufficient to give New Plantation viable independence as a corporation. The Tax Court found that the corporate assets of New Plantation were "wholly inadequate to sustain a debt of $609,878.33". The Commissioner suggests that *Murphy Logging,* supra, the keystone in appellants' argument, is distinguishable. The Commissioner argues that in *Murphy Logging,* the guarantee of a guarantor-stockholder was held not significant because the corporation had substantial ability to meet its debts without the aid of a guarantor, a factor absent in this case. Further distinction is noted in that in *Murphy Logging* the Ninth Circuit was not dealing with a thinly capitalized corporation, as is the case here. The Commissioner discounts the fact that New Plantation was in actuality able to pay its obligations without resort to its guarantors, pointing out that we must view the transaction on the basis of the economic realities as they existed at New Plantation's inception, and not in the light of later developments. As matters stood September 28, 1962, asserts the Commissioner, the deal had not set up a bona fide corporation reasonably to be expected to manage to go it alone, and later developments do not alter the nature of the transaction for tax purposes.

Making further use of the debt vs. equity criteria established by *Montclair* and later cases, the Commissioner notes particularly that the sellers took the unusual step of agreeing to subordinate all but $100,000 of the purchase money notes. The Commissioner asserts that this action was taken because the sellers looked first and foremost to the guarantee of Mr. Jemison, an obligation which was primary in nature.

The Commissioner also claims that no third party arm's-length creditors, because of New Plantation's paper thin capitalization, would have loaned the amount of money by which the corporation became indebted. Establishment of any indebtedness, argues the respondent, would have required Mr. Jemison's guarantee, and therefore for tax purposes the indebtedness should be regarded as that of the Jemisons.

■ Resolving these two conflicting views of this amorphous transaction is no easy task, but we are not persuaded that the taxpayers have successfully demonstrated the incorrectness of the position taken by the Tax Court. Certainly we recognize that this transaction was initially cast to have all of the outward appearances of a debt transaction, complete with instruments styled "debentures" which had fixed maturity dates. But these surface considerations do not end our examination. Closer scrutiny establishes that the other factors which would give the transaction the aura of debt are noticeable by their absence.

■ Of critical importance in determining whether financial input is debt or equity is whether or not the money is expended for capital assets. In the instant case the substantial portion of the $609,878.33 was directed to the purchase of capital assets and to finance initial operations. In contrast, only $5,-000.00 was set up as equity to finance launching of the corporate venture.

Other equity factors exist. While the sellers were ostensibly to look to the corporation for payment of the debt, it is apparent from the meager capital position of the company that Mr. Jemison's guarantee was regarded as the real undergirding for the deal. Our conclusion is reinforced by noting that the sellers apparently considered financially acceptable the agreement to subordinate the great majority of the 5½% debentures to almost all other corporate indebtedness so long as the debentures were guaranteed by Mr. Jemison. Mr. Jemison's guarantee was, of course, an obligation primary in nature.

Further, while Mrs. Jemison was the stockholder of record, and Mr. Jemison on the surface was only a guarantor, surrounding circumstances clearly demonstrate that Mr. Jemison completely controlled the shares held by Mrs. Jemison. Mrs. Jemison seldom attended the meetings of the corporation, and took little active interest in it. In contrast, Mr. Jemison was intimately and continuously involved in the operations of New Plantation. Regarding Mr. Jemison as the "constructive" owner of the stock, we have an identity of interest between the stockholder and the guarantor—a factor which points strongly toward equity treatment.

The record cannot support a determination by us that the Tax Court's finding that New Plantation was thinly capitalized is "clearly erroneous".[9] The balance sheet of the corporation showed that its quick assets (cash and accounts receivables) of $317,000 could not cover its current liabilities of approximately $490,000. This ratio is one of the acid test indicators used by businessmen to determine the health of a business. After the dissolution of Old Plantation the new corporation had tangible assets, at fair market value, of approximately $1,-064,000 securing debts of approximately $1,078,000. We regard this as thin capitalization, as did the Tax Court.

The guarantee enabled Mr. Jemison to put a minimum amount of cash into New Plantation immediately, and to avoid any further cash investment in the corporation unless and until it should fall on hard times. At the same time he exercised total control over its management. Adding together the personal guarantee of Mr. Jemison to the guarantee of Jemison Investment Company, which was wholly owned by him and Mr. Jemison's control of New Plantation, we think that the result is that Mr. Jemison's guarantee simply amounted to a covert way of putting his money "at the risk of the business". Stated differently, the guarantee enabled Mr. Jemison to create borrowing power for the corpo-

9. Rule 52(a), Federal Rules of Civil Procedure, under which we review decisions of the Tax Court. See Section 7482(a), Internal Revenue Code of 1954, Title 26, U.S.Code Section 7482(a).

ration which normally would have existed only through the presence of more adequate capitalization of New Plantation.

■ We do not regard as significant the fact that ultimately things progressed smoothly for New Plantation and that its debts were paid without additional financing. The question is not whether, looking back in time, the transaction was ultimately successful or not, but rather whether at its inception there was a reasonable expectation that the business would succeed on its own. The transaction must be judged on the conditions that existed when the deal was consummated, and not on conditions as they developed with the passage of time. See Mertens Law of Federal Income Taxation, Vol. 4A (1966 Revision) Sec. 26.-10c, Ch. 26, page 75; Moughon v. C. I. R., 6 Cir. 1964, 329 F.2d 399, 401. When New Plantation was incorporated its prospects of business success were questionable indeed without the Jemison guarantees.

■ We hold also that the Tax Court was correct in refusing to give value to the intangible financial skills of Mr. Jemison for purposes of computing the corporation's debt-equity ratio. We reach this decision despite noting appellants' contention that the showing here of relation of Mr. Jemison's skills to the well-being of New Plantation is much stronger than the showing of intangible stockholder assets which were considered relevant in *Murphy Logging*, supra.[10] We are bound by decisions of the Ninth Circuit only as we find them persuasive. In our view courts should be wary in giving weight to such intangible assets as those attributed to Mr. Jemison. Certainly business acumen or financial wizardry of stockholders or corporate management could not properly be valued and placed on the corporate balance sheet under generally accepted principles of accounting, although they might afford

window dressing in a footnote. With deference to the Ninth Circuit, we conclude that intangible assets such as those claimed for Mr. Jemison have no place in assessing debt-equity ratio unless it can be shown by convincing evidence that the intangible asset has a direct and primary relationship to the well-being of the corporation. Additionally it seems clear to us that the assets sought to be valued must be something more than management skills and normal business contacts. These are expected of management in the direction of any corporation.

We decide only this case. We do not assert that intangible assets are never a proper consideration in assessing debt-equity ratio. Nevertheless we agree with the Tax Court that courts should proceed cautiously in giving value to such intangible assets in the absence of special circumstances demonstrating a primary relationship to the corporation. That standard is not met by evidence that Mr. Jemison was a talented business man with useful contacts among department stores.

Our holding does not require that we find the notes held by Bradford and Company to be equity interests. While the Bradford and Company notes were subordinated, subordination is far from the sole criterion for determining whether an interest is debt or equity. It is not controlling. Aside from this single factor this record is productive of nothing to indicate that this was not a bona fide loan made by Bradford with the primary motive of inducing New Plantation to employ young Bradford. We agree with the Tax Court that this was a legitimate loan.

V.  SHOULD THE EQUITY CONTRIBUTION BE DEEMED TO HAVE BEEN MADE BY JEMISON INVESTMENT COMPANY RATHER THAN BY MR. JEMISON?

■ The Tax Court found that the equity contribution was to be attributed

---

10. The appellants have attached to their brief a copy of a portion of the *Murphy* *Logging* record dealing with intangible contributions by its stockholders.

to Mr. Jemison and not to Jemison Investment Company. Although acknowledging that Jemison Investment Company received a fee of $15,000.00 for its guarantee on the notes, the Tax Court reasoned that inasmuch as Mr. Jemison controlled both Jemison Investment and New Plantation, the fee for the guarantee was either a matter of internal accounting or for cosmetic effect, and not an indication that the sellers of Old Plantation realistically looked to Jemison Investment Company for any security. It is uncontested that practically all of Mr. Jemison's assets consisted of stock in Jemison Investment Company. It owned the house he lived in and the automobile he drove, but he owned it in its entirety. Furthermore, the Tax Court found that the sellers of Old Plantation only investigated the credit of Mr. Jemison, and that the Messrs. Jernigans as sellers looked at all times to Mr. Jemison's guarantee as the real insurance for the notes.

Although the appellants cast some doubt on the Tax Court's finding that the sellers did not investigate the financial statements of the Jemison Investment Company, in no other respect have they demonstrated error in the Tax Court's conclusion that through all of the haze of corporate red tape, the real financial keystone supporting the entire deal, the person to whom the sellers ultimately looked for their protection in the event of the failure of New Plantation was Mr. John S. Jemison, Jr.

## VI. CONCLUSION

Error is not demonstrated on this record. None of the Tax Court's Findings and Conclusions based upon stipulated facts are shown to be "clearly erroneous". The decision of the Tax Court as to all matters raised by this appeal is

Affirmed.