DONALD LEE ATKINSON and EMMA J. ATKINSON, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Atkinson v. Commissioner
Docket No. 4179-83
United States Tax Court
T.C. Memo 1984-378; 1984 Tax Ct. Memo LEXIS 292; 48 T.C.M. (CCH) 577; T.C.M. (RIA) 84378; July 24, 1984. Donald Lee Atkinson, pro se. James R. Million, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice mailed on November 30, 1982, respondent determined a deficiency of $16,930.59 in petitioners' Federal income tax liability for 1977. After concessions, the only issue remaining for decision is whether petitioners are entitled to a claimed $75,000 bad *293 debt deduction in connection with payments they were required to make under personal guarantees of loans of a closely held corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The petitioners, Donald Lee and Emma J. Atkinson, are husband and wife and resided in Holden, Missouri, at the time they filed their petition herein. Petitioners timely filed their 1977 joint Federal income tax return. Although Emma J. Atkinson was not actively involved in the business, she did join in executing the loan guarantees described below. Subsequent references to "petitioner" refer only to Donald Lee Atkinson. Petitioner has been involved in various aspects of the electronics business for approximately twenty years. He was a full time employee of several major electronics companies from 1959 through 1965. After 1965, he was employed as a television repairman for approximately five years. In or about 1970, petitioner became self-employed as a radio and television repairman and he performed contract work for various companies in Missouri. Although the time frame is unclear from the record, petitioner also was involved as a partner in a partnership which *294 operated a retail C.B. radio store in Chilahowee, Missouri. In addition, petitioner owned a farm and was engaged in farming throughout the 1970's. Petitioner decided in 1975 to import C.B. radios and sell them at retail. He enlisted the services of David Erisman, who had some prior experience in the import business, to assist him. Petitioner and Mr. Erisman decided to form a corporation to conduct the business. They incorporated Power Communications, Inc. (hereinafter referred to as "Power") under the laws of the State of Missouri on October 6, 1975. Petitioner and David Erisman have each owned 50% of the outstanding stock of Power since its incorporation. Upon incorporation, each contributed $250 for a total of $500 invested capital. The reason only $500 was invested in Power upon incorporation is that this was the minimum capital required for a corporation in the State of Missouri in 1975. In order to finance acquisition of Power's opening inventory of radios, a loan was obtained in the name of Power in the amount of $17,537.50 from the Farmers and Commercial Bank of Holden, Missouri, on February 23, 1976. This loan was evidenced by a note and was personally guaranteed *295 by petitioners. The record does not indicate whether Mr. Erisman participated in the guarantees. Two deeds of trust and 250 C.B. radios were given as security for the loan. A second loan was obtained in the name of Power from the same bank on May 25, 1976, in the amount of $65,000. This loan also was personally guaranteed by petitioners and was evidenced by a note. The security given for this loan was the same as for the first loan, with the addition of 1,000 C.B. radios. The proceeds of this loan also were used to purchase C.B. radios for Power's inventory. For unexplained reasons, the first note was rewritten on May 24, 1977, and the second note was rewritten on August 16, 1977. Each of the new notes reflected petitioners, rather than Power, as the maker of the note. In 1977, Power was experiencing financial difficulties and was unable to make payments on the notes. Therefore, petitioner was called upon by the bank creditor to pay $74,892.50 pursuant to his personal guarantees. Of this amount, petitioner actually paid a total of $22,987.50 in 1977. Power has not repaid petitioner any portion of the $22,987.50, and Power ceased doing business in 1977. Petitioners reported *296 a $75,000 business bad debt deduction on their 1977 joint Federal income tax return with respect to the loan guarantees. Power obtained additional loans from the Farmers and Commercial Bank of Holden, Missouri, on the following dates and in the following amounts: Date
Amount
Dec. 18, 1975
$ 6,000.00
Dec. 19, 1975
13,000.00
Jan. 12, 1976
19,000.00
Jan. 15, 1976
25,750.00
Aug.  4, 1976
4,392.50
Sep. 14, 1976
10,000.00
Oct. 16, 1976
2,000.00
Oct. 29, 1976
500.00
Jan. 20, 1977
16,592.53
Total Additional Loans
[1] $97,235.03
With respect to the loans listed immediately above, the stipulation states: "These notes were repaid at various times by Power or petitioners. Petitioners were guarantors on some, and probably all, of the above notes." OPINION The issue to be decided in this case is whether petitioners are entitled to an ordinary deduction as a result of business bad debts for the payments which they made pursuant to the loan guarantees involved herein. Respondent argues that the payments petitioners made give rise to capital losses *297 on the grounds that the payments constituted capital contributions to Power or, in the alternative, that the debts with respect to which the payments were made were nonbusiness bad debts.Respondent also argues that, in any event, the amount claimed by petitioners in excess of the $22,987.50 actually paid by petitioners in 1977 is not deductible. It is well recognized that payments made by a shareholder pursuant to guaranteed debt obligations may constitute capital contributions to the corporation on whose behalf the guarantees were made. Smyers v. Commissioner,57 T.C. 189, 198 (1971); Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 550 (1968); Casco Bank & Trust Co. v. United States,544 F.2d 528 (1st Cir. 1976), cert. denied, 430 U.S. 907 (1977); Plantation Patterns, Inc. v. Commissioner,462 F.2d 712, 723 (5th Cir. 1972), affg. a Memorandum Opinion of this Court. If the payments are treated as capital contributions, petitioner is not entitled to a bad debt deduction under section 166 of the Internal Revenue Code *298 of 1954, as amended and the regulations promulgated thereunder. [2]
The analysis traditionally followed in determining whether payments made by a shareholder with respect to guaranteed debt are to be treated as capital contributions is to consider all of the facts in light of the traditional debt versus equity criteria. Smyers v. Commissioner,supra at 198; Santa Anita Consolidated, Inc. v. Commissioner,supra at 550. These criteria include, *299 among others, the formal indicia of debt, the availability of outside credit, the repayment history and prospects, whether there was subordination of the debt, the use made of the loan proceeds, whether participation in management occurred as a result of the payments, the adequacy of the capital structure (including the debt/equity ratios) and the intent of the parties. See e.g., Dixie Dairies v. Commissioner,74 T.C. 476, 493 (1980); United States v. Uneco, Inc.,532 F.2d 1204 (8th Cir. 1976). Some of these debt/equity criteria typically are not applicable to guaranteed debt situations. This is due to the fact that in such situations the shareholders do not actually loan money to the corporation, but rather loan their personal credit which allows the corporation to obtain funds from a third party. It is also established that no deduction for a bad debt or capital loss is available unless (and only to the extent) the taxpayer has made an outlay of cash or of property having a cash value. Crown v. Commissioner,77 T.C. 582, 592 (1981); *300 Helvering v. Price,309 U.S. 409 (1940). Giving a guaranty or the substitution of a guarantor's personal note for that of the stated primary obligator, in satisfaction of the guaranty, does not constitute such an outlay until the note is actually paid. Crown v. Commissioner,supra at 593; Perry v. Commissioner,49 T.C. 508 (1968); Eckert v. Burnet,283 U.S. 140 (1931). We find that the payments involved herein were contributions of capital and that petitioners' capital loss in 1979 is limited by the $22,987.50 he actually paid in that year. It is apparent that Power was severely undercapitalized. The initial (and only) stated paid-in capital of $500 related simply to the minimum capitalization requirements of Missouri law, and not to any estimate of the actual needs of the business. See Estate of Miller v. Commissioner,24 T.C. 923 (1955). Funds derived from the bank loans which petitioner personally guaranteed were required to obtain the initial inventory with which Power commenced business operations.No outside credit was available to Power except upon the personal credit and guarantee *301 of petitioner. With the capital of only $500, any repayment of the loans by Power was totally dependent upon the success of Power, a factor strongly indicating undercapitalization. See Gilbert v. Commissioner,248 F.2d 399, 407 (2nd Cir. 1957). Power's inordinately high debt/equity ratios support our conclusion. These ratios ranged from 35 to 1 initially (obtained by dividing the initial loan proceeds of $17,537.50 by $500 capital), to a high of 193 to 1 on October 29, 1976, when the total outstanding principal debt reached its highest level of $96,380.03. It appears to us that there never was a bona fide debtorcreditor relationship between petitioner and Power. See Casco Bank & Trust v. Commissioner,supra at 533. The nature of the relationship was demonstrated when the notes were rewritten in 1977, designating petitioners rather than Power as the makers of the notes. Because the bank was relying on petitioners' credit and not Power's, petitioners were the true borrowers of the money which they then, in effect, contributed as capital to Power. The nature of the transactions herein are very similar to those involved in Plantation Patterns, Inc. v. Commissioner,462 F.2d 712 (5th Cir. 1972). *302 Therein, a corporate officer who controlled the majority of the shares of the corporation personally guaranteed a loan to creditors of the corporation. The Court's observations in that case are applicable to the present one: The guarantee enabled Mr. Jemison to put a minimum amount of cash into New Plantation immediately, and to avoid any further cash investment in the corporation unless and until it should fall on hard times. . . [W]e think that the result is that Mr. Jemison's guarantee simply amounted to a covert way of putting his money "at the risk of the business." Stated differently, the guarantee enabled Mr. Jemison to create borrowing power for the corporation which normally would have existed only through the presence of more adequate capitalization of New Plantation. (462 F.2d at 722-723) Petitioner, who is appearing pro se, does not understand how, since he "lost" more money than he "made" in 1977, he could possibly owe any taxes. The reason, of course, is that for Federal income tax purposes capital losses cannot be offset directly against petitioner's ordinary *303 income, except to the limited extent authorized by the Internal Revenue Code of 1954, as amended. Petitioner apparently does not understand that ordinary and capital losses are treated differently because they are considered under the law to be of a different character. [3]
In light of our resolution of the debt/equity issue, we need not address the nonbusiness bad debt argument made by respondent. Petitioners will be allowed a capital loss on the payments *304 they actually made in 1977 with respect to their guaranty of the debts of Power, subject to the limitations imposed on capital losses by section 1211 and other appropriate sections of the Internal Revenue Code of 1954, as amended. To reflect concessions of the parties and in light of the above conclusions, Decision will be entered under Rule 155.
Footnotes
1. The highest total debt outstanding at any one time was $96,380.03, the balance on October 29, 1976.↩
2. Section 1.166-9(c), Income Tax Regs., provides: (c) Obligations issued by corporations
No treatment as a worthless debt is allowed with respect to a payment made by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor, endorser, or indemnitor of an obligation issued by a corporation if, on the basis of the facts and circumstances at the time the obligation was entered into, the payment constitutes a contribution to capital by a shareholder.↩
3. Neither party has raised the applicability of section 1244, which allows ordinary loss treatment, up to specified limits, on which otherwise would be a capital loss on qualifying small business corporation stock. However, it is clear that this section is not properly applicable to this case because the stock involved, which was issued prior to November 1978, was not issued pursuant to a plan, as required under section 1.1244(c)-1(f), Income Tax Regs. In addition, while we have considered it, we find no evidence in the record which would support the application of the Corn Products doctrine as set forth in Corn Products Refining Co. v. Commissioner,350 U.S. 46↩ (1955).