ELENOR LORENE STONEKING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stoneking v. Commissioner
Docket No. 7265-84.
United States Tax Court
T.C. Memo 1985-532; 1985 Tax Ct. Memo LEXIS 100; 50 T.C.M. (CCH) 1301; T.C.M. (RIA) 85532; October 15, 1985. Paul C. Guzik, for the petitioner. Miles D. Friedman, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Year
Deficiency
1977
$5,093.85
1978
14,072.43
1979
1,274.00
1980
9,394.37
After concessions by the parties, the remaining issues for decision are (1) whether petitioner is entitled to a bad debt deduction in 1980 [1] for funds advanced directly to her wholly owned corporation and for funds advanced to a bank pursuant to her guarantee of the corporation's debt, and (2) if so, whether the bad debt is a business bad debt or a nonbusiness bad debt. *102 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of the filing of her petition, petitioner Elenor Stoneking resided in San Diego, California. Petitioner and her husband, George M. Stoneking (George), filed joint Federal income tax returns for the calendar years 1977, 1978, and 1979, and petitioner filed a single Federal income tax return for 1980. In or about 1965, George purchased or started Stoneking Realty, Inc. (Stoneking Realty), a real estate business located in San Fernando Valley. George was president of Stoneking Realty, a licensed real estate broker, and was paid a salary by the corporation. Petitioner was secretary-treasurer of Stoneking Realty; however, she was not a licensed real estate broker and was not paid a salary by the corporation. On the joint tax returns, petitioner identified her occupation as homemaker or housewife. From 1965 through 1972, petitioner and George advanced funds to Stoneking Realty and received promissory notes bearing 5 percent interest and no maturity date. Stoneking Realty made no periodic payments of interest or principal *103 on the notes but paid the entire balance in June 1976. [2]
In the 1970's, Stoneking Realty needed additional funds as a result of expansion and the opening of new offices. Thus, from 1974 through 1978, Stoneking Realty obtained four loans totaling $55,000 from Security Pacific National Bank of Poway (Security Pacific). For security, Security Pacific required George's and petitioner's personal guarantee of the loans. In addition to its outside financing, Stoneking Realty frequently generated substantial bank overdrafts in one or more checking accounts. The 1978 financial statement showed bank overdrafts totaling $16,142.65. On January 14, 1979, George died and petitioner inherited Stoneking Realty. Although she did not have a real estate license or previous working experience with the corporation, petitioner soon initiated several financial transactions involving herself and Stoneking Realty.On February 1, 1979, she borrowed $100,000 from Security Pacific and executed an interest *104 bearing note secured by petitioner's $100,000 certificate of deposit. With the $100,000, petitioner paid off the four loans from Security Pacific to Stoneking Realty ($55,000), paid off a personal loan from Security Pacific to George ($6,930.92), and advanced $35,939.21 directly to Stoneking Realty for operating expenses. The corporation recorded the $35,939.21 contribution on its books as "New Loan from Stockholders"; however, the corporation did not execute a note, did not define any credit terms, and did not make any arrangements for repayment to petitioner. Throughout 1979, petitioner unsuccessfully tried to sell Stoneking Realty. She therefore continued to run the business, using outside brokers possessing required licenses. George's death and rising interest rates, however, soon weakened Stoneking Realty's business, and sales declined from $651,124 in 1978 to $348,258 in 1979. Although petitioner was disheartened by the demise of a business George had worked so hard to build, she was nevertheless very anxious to sell Stoneking Realty. To keep the company running and to meet operating needs, petitioner advanced an additional $40,100 in 11 payments from February to September *105 1980. Again, the corporation did not execute a note, did not define any credit terms, and did not make any arrangements for repayment of these advances to petitioner. From 1972 to 1980, Stoneking Realty reported income and losses as follows: Fiscal year
ended June 30
Net income (loss)
1972
$ (2,783)
1973
(3,813)
1974
(5,019)
1975
(3,064)
1976
30,846 1977
(16,655)
1978
2,047 1979
(35,575)
1980
(44,963)
From 1977 to 1980, Stoneking Realty reported the following on its financial statements: Fiscal Year Ended
June 30
1977
1978
1979
1980
Total Assets
* $90,645
$74,392
$81,698 $66,723 Liabilities
76,254
57,954
100,835 130,823 Cap. Stock
2,000
2,000
2,000 2,000 Ret Earnings
12,391
14,438
(21,137)
(66,100)
Total Equity
14,391
16,438
(19,137)
(64,100)
Total Liab. & Equity
90,645
74,392
81,698 66,723 On August 15, 1980, petitioner finally sold Stoneking Realty. William Barger and Donald Salvati purchased the company for $54,490 [3] to be paid in installments commencing on or before September 1, 1980, and ending *106 October 1, 1984. Subsequent to this transaction, petitioner's $10,000 personal note came due, and Security Pacific satisfied the note with petitioner's certificate of deposit. Petitioner paid a total of $14,912 in interest ($8,711.10 in 1980) on the loan. On her 1980 income tax return, petitioner claimed a business bad debt deduction of $155,012. A schedule attached to petitioner's return itemized the deduction as follows: $100,000 note to Security Pacific, $40,100 advanced by petitioner to Stoneking Realty in 1980, and $14,912 of interest paid by petitioner on the $100,000 note. Respondent disallowed the business bad debt deduction on the following alternative grounds: (1) the advances by petitioner were capital contributions rather than loans, and (2) if the advances, or any portion thereof, were loans, Stoneking Realty's debt to petitioner was a nonbusiness bad debt rather than a business bad debt. ULTIMATE FINDING OF FACT Petitioner did *107 not create a debtor-creditor relationship when she made the advances to and on behalf of Stoneking Realty. OPINION The threshold question is whether petitioner's advances to and on behalf of Stoneking Realty were loans or capital contributions. If the advances were loans, petitioner is entitled to a bad debt deduction, and further inquiry must be made as to whether the bad debts were business bad debts or nonbusiness bad debts. In computing the bad debt deduction claimed on her return, petitioner included her $100,000 personal debt to Security Pacific (paid off with her certificate of deposit). Some portions of this loan, however, did not directly or indirectly benefit Stoneking Realty; therefore, we deem it necessary to consider each portion of the loan separately. Obviously, any portion of the $100,000 loan not shown to be in any way related to Stoneking Realty, such as the repayment of George's loan, cannot be either debt or equity in Stoneking Realty. Only petitioner's contributions to and on behalf of Stoneking Realty, i.e., $55,000 for payment of Stoneking Realty guaranteed debt, $35,939.21 advanced to Stoneking Realty in 1979, and $40,100 advanced to Stoneking Realty *108 in 1980, can be classified as either debt of or equity in Stoneking Realty. Because two of these advances were direct contributions and the other was a payment of a guaranteed debt, we consider them separately. Direct Advances
Section 166(a)[4] allows a deduction for any debt that becomes worthless within the taxable year. If the debt is a nonbusiness debt, [5] an individual taxpayer is only allowed to deduct the loss as a short-term capital loss. Section 1.166-1(c), Income Tax Regs., provides that only a "bona fide debt" qualifies for deductibility, and that "[a] bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Contributions to capital are not considered debt for purposes of section 166. Section 1.166-1(c), Income Tax Regs.
*109 Characterization of the advances as either loans or capital contributions is a question of fact that must be determined by reference to all of the evidence. See, e.g., Casco Bank & Trust Co. v. United States,544 F.2d 528, 534-535 (1st Cir. 1976); Gilbert v. Commissioner,262 F.2d 512, 574 (2d Cir. 1959). Petitioner bears the burden of proving that the advances were loans. Welch v. Helvering,290 U.S. 111 (1933); Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980); Rule 142(a), Tax Court Rules of Practice and Procedure.
The courts have developed objective criteria for determining whether a shareholder's advance is debt or equity. [6] In O. H. Kruse Grain & Milling v. Commissioner,279 F.2d 123, 125-126 (9th Cir. 1960), the Court of Appeals for the Ninth Circuit, to which this case is appealable, listed 11 factors for consideration: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status *110 equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions. These factors are not necessarily of equal weight. As we stated in Dixie Dairies Corp. v. Commissioner,74 T.C. at 493-494: The identified factors are not equally significant, nor is any single factor determinative. Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms *111 of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" [Citations omitted.] After carefully considering the facts and circumstances surrounding petitioner's direct advances to Stoneking Realty ($35,939.21 in 1979 and $40,100 in 1980), we conclude that they were capital contributions, placed at the risk of the business, rather than loans. The advances were not represented by notes or other certificates of indebtedness (factor 1), and no maturity dates were specified (factor 2). The absence of repayments during the critical years, loss years, indicates that the source of repayment was tied to the fortunes of the business (factor 3). Petitioner argues that one of her advances, $35,939.21, was recorded on the corporation's books as a "New Loan from Stockholders;" however, we are not convinced that this fact entitled petitioner to *112 enforce payment of principal or interest (factor 4). It was merely a bookkeeping entry of little value without the support of other objective criteria. See DixieDairies Corp. v. Commissioner,74 T.C. at 495. See also Fin HayRealty Co. v. United States,398 F.2d 694 (3d Cir. 1968). During the years petitioner made the direct advances, she represented 100 percent of the management and control of Stoneking Realty (factor 5). Also, the record does not indicate any outside lenders to whom petitioner might have subordinated her interest (factor 6). The record only reveals one outside lender, Security Pacific, whose interest in Stoneking Realty was terminated (guaranteed loan paid off) at the same time petitioner made her first direct advance. Petitioner testified at trial and argues on brief that she intended to create a debtor-creditor relationship with Stoneking Realty (factor 7). Our determination of petitioner's intent, however, cannot be based on a subjective analysis; it must be determined from considering all the objective facts and circumstances surrounding the advances. *113 In re Lane,742 F.2d 1311, 1316 (11th Cir. 1984); Estate of Mixon v. United States,464 F.2d 394, 407 (5th Cir. 1972); Tyler v. Tomlinson,414 F.2d 844, 850 (5th Cir. 1969). Based on the surrounding circumstances, we find that petitioner did not intend to create a loan at the time of either of the advances. In an attempt to salvage the faltering company, petitioner advanced funds to the corporation when necessary and, so far as the evidence shows, without any thought of being a creditor. There were no notes issued, no interest rates or maturity dates specified, and no arrangements that provided for payments in return. Courts also consider the thinness of a corporation's capitalization (factor 8) to determine if an advance is in the nature of debt or equity. If a corporation is so thinly capitalized that a commercial lender might consider a loan too risky, a shareholder's advance may be deemed to be capital in nature. See Gilbert v. Commissioner,248 F.2d 399, 407 (2d Cir. 1957). Generally, this determination is made from a comparison of the corporation's total debt to total equity. Stoneking Realty's debt to *114 equity ratio is computed as follows: [7]
Fiscal
A
B
Year
Total
Total
Ended
Outside
Owner's
Ratio
June 30
Liabilities
Equity
A to B
1977
$76,254.32
$14,390.73 5.3/1
1978
57,954.03
16,437,96 3.5/1
1979
108,835.14
(19,137.21)
indeterminate
1980
130,823.00
(64,100.00)
indeterminate
Based on the low (1977 and 1978) and negative (1979 and 1980) owners equity account and the immeasurable ratio in 1979 and 1980, a loan would seem risky to a bank, particularly a loan the size of any of petitioner's advances. Thus, Stoneking Realty appears to be thinly capitalized. *115 Identity of interest between creditor and stockholder (factor 9) was a full 100 percent. Also, payment of interest out of "dividend" money (factor 10) did not occur; in fact, petitioner did not receive payments of any kind in return for the advances in issue. In 1976, however, petitioner and George did receive payment of interest out of profits or "dividend" money. The advance for which this payment was received is not in issue, but the transaction does reflect a capital interest on petitioner's part, rather than a creditor's interest. Finally, Stoneking Realty did not possess the ability to obtain outside financing (factor 11) without the personal guarantee of its owner. The only outside financing Stoneking Realty obtained was from Security Pacific, which required petitioner's and George's personal guarantee. Furthermore, petitioner's expert witness, a bank officer, upon being shown Stoneking Realty's balance sheet for 1979, stated that, based on that information alone, he could not offer the company a loan. Based upon the entire record, we conclude that petitioner's direct advances to Stoneking Realty were capital contributions. Payment of Guaranteed Debt
*116 Payment by a shareholder of a guaranteed debt obligation may be deemed either a contribution of capital or a loan to the corporation for which the guarantee was made. Casco Bank & Trust Co. v. United States,544 F.2d 528, 532-535 (1st Cir. 1976); Plantation Patterns, Inc. v. Commissioner,462 F.2d 712, 723 (5th Cir. 1972), affg. a Memorandum Opinion of this Court; Smyers v. Commissioner,57 T.C. 189, 198 (1971); Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 550 (1968). To determine whether such a payment is a capital contribution or a loan, courts apply the traditional debt-equity principles. Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. at 550; Plantation Patterns, Inc. v. Commissioner,462 F.2d at 723. Underlying these general principles is the ultimate question of whether there was, at the time of the guarantee, a "genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship." *117 Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 494 (1980). The facts surrounding the guarantee do not indicate an objective intent on petitioner's part to create a debtor-creditor relationship. Petitioner and George controlled management; the corporation was only capitalized by a $2,000 investment; and the corporation did not receive outside financing without petitioner's and George's help. Indeed, it seems that the guarantee enabled petitioner and her husband to maintain a low capital investment in Stoneking Realty while using borrowed funds for expansion and operating expenses. The guarantee, at least initially, allowed petitioner and her husband to create borrowing power for the corporation that would have been available only with more adequate capitalization. Plantation Patterns, Inc. v. Commissioner,462 F.2d at 722. As a result, we hold that petitioner's payment of the guaranteed loan was a contribution of capital. In conclusion, we have determined that all three of petitioner's contributions were capital contributions; therefore, petitioner is not entitled to a bad debt deduction for 1980. Because we resolve this issue in favor of respondent, *118 it is unnecessary to address the issue of whether the claimed bad debt was a business bad debt or a nonbusiness bad debt. In view of our conclusion, however, petitioner is entitled to deductions under section 163 in the appropriate years for interest paid or accrued by her on the $100,000 loan. The parties stipulated that petitioner paid $14,912 of interest in 1979 and 1980, and the record indicates that $8,711.10 was paid in 1980. Also, petitioner is entitled to a capital loss deduction on the sale of her Stoneking Realty stock in 1980 based on a sales price of $54,490 and an adjusted basis of $133,039.21 (section 1012 cost basis of $2,000 plus section 1016(a)(1) adjustments for capital contributions of $55,000, $35,939.21, and $40,100). We have considered all other arguments of the parties and have found them to be without merit. To reflect concessions of the parties and in light of the above conclusions, Decision will be entered under Rules 155.
Footnotes
1. Parties agree that the deficiency for the year 1979 is $1,076. The deficiencies for the years 1977 and 1978 arose from the disallowance of the carryback of unused losses from 1980. The 1980 loss arose because petitioner claimed the business bad debt deduction at issue herein.↩
2. Although the character of these transactions is not before the Court, we recognize the facts as one indication of petitioner's underlying intent regarding contributions to the corporation.↩
*. rounded to nearest dollar.↩
3. There was some confusion as to the contract sales price; however, the parties agreed that $54,490, the amount shown on petitioner's 1980 Federal income tax return, would be used to calculate petitioner's gain or loss on the sale.↩
4. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. ↩
5. A nonbusiness debt is defined in section 166(d)(2) as a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
6. Section 385 authorizes the Secretary of the Treasury to prescribe regulations for determining whether an interest in a corporation is stock or indebtedness. Final regulations have not been issued.↩
7. Since we ultimately find petitioner's advances to be capital contributions, the owner's equity account should be adjusted accordingly for years petitioner made advances: 1979 and 1980. This would improve Stoneking Realty's financial picture (and debt/equity ratios); however, we do not make the adjustments here. These figures should reflect the financial condition exhibited by the company at that time. Naturally, it is these figures that a bank would have examined at that time in its determination of the thinness or adequacy of the corporation's capitalization.↩