JOHN C. HUNTER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hunter v. Commissioner
Docket No. 11519-78.
United States Tax Court
T.C. Memo 1982-381; 1982 Tax Ct. Memo LEXIS 366; 44 T.C.M. (CCH) 385; T.C.M. (RIA) 82381; July 7, 1982. *366 During the years 1957 to 1974, petitioner acquired interests in a number of business enterprises. These interests generally were acquired by petitioner with a view to increasing their value through his personal efforts and through the infusion of capital. In 1970 petitioner incorporated General Illumination as sole shareholder. Thereafter, he executed guaranties of a number of loans to General Illumination from various creditors. In 1973 General Illumination declared bankruptcy and petitioner was required to honor the guaranties in the amount of $287,437.42. Held, the guaranties did not constitute bona fide debt obligations, but rather constituted capital contributions to General Illumination to the extent of the payments on such guaranties. Held further, petitioner was not engaged in the trade or business of developing and promoting corporations, and therefore the loss incurred by petitioner is governed by sec. 165(g)(1), I.R.C. 1954. Held further, respondent did not timely raise the issue of whether petitioner's "stock" in General Illumination became worthless in 1974. Milton D. Price, Jr., for the petitioner. James C. Lanning, for the respondent. STERRETT
MEMORANDUM FINDINGS *367 OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated July 14, 1978, respondent determined a deficiency in the amount of $115,726 in petitioner's Federal income tax for the taxable year 1971. The issues for decision are: (1) whether certain guaranties by petitioner in substance constituted contributions to the capital of a corporation rather than bona fide debt obligations; (2) whether petitioner's activities with respect to the corporation in question were performed in the separate trade or business of developing and promoting corporations; (3) whether respondent timely raised the issue of whether the debts, or alternatively petitioner's "stock" in the corporation, became worthless at any time during the 1974 taxable year; (4) if so, whether such debts or stock did in fact become worthless. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner John C. Hunter resided in St. Paul, Minnesota at the time of filing the petition herein. For the taxable years 1971 and 1972, petitioner and his wife, Patricia Hunter, filed joint Federal income tax *368 returns with the Office of the Director, Internal Revenue Service. Petitioner filed an individual Federal income tax return for the taxable year 1974 with the Internal Revenue Service Center, Ogden, Utah. After completing college, petitioner was employed by Northwest Airlines in various capacities in various localities from 1948 to 1953, at which time he moved to St. Paul. Subsequently, petitioner was employed by Brown and Bigelow, generally in a sales capacity, from 1953 to 1957. During that period of time, petitioner started up two small businesses, a coffee service company, which delivered hot coffee in the Twin Cities area, and another company under the name of Abunda Vita, which was, as one might suspect, a health supplement vitamin company. In 1953, petitioner began looking for opportunities to form new companies or purchase existing ones with a view to increasing their value through his personal effort and the infusion of capital. From his perspective, the most attractive companies for purchase were those that he perceived to be underfinanced or in a state of mismanagement. From the outset, he never intended to retain ownership in the businesses, but to sell them at *369 a profit. From 1957 to 1963, petitioner's principal activities centered around the radio business. In 1957 petitioner and Richard K. Power together built a new radio station (WCMP) in Pine City, Minnesota. The station was sold to its station manager in 1964 with petitioner reaping a $33,900 profit from his 58-percent ownership. In the fall of 1957 petitioner and others purchased a radio station (KOWB) in Laramie, Wyoming. Petitioner held a 60-percent ownership interest in the station with the minority shareholders consisting of petitioner's father and Richard K. Power. [1] This enterprise was sold in 1960 at a profit to petitioner of $34,697. In 1958 petitioner helped form General Broadcasting Co. as a 33-1/3-percent owner. Although the business was sold in 1960, the corporate entity was retained for other purposes until 1971. KIMN, a radio station in Denver, Colorado was purchased in 1960 by petitioner and others. Petitioner, who was a 33-1/3-percent shareholder in the corporation, sold his interest in 1971 at a profit of $1,894,103. [2] *370 In 1962, petitioner formed an insurance agency known as the Roger Dougherty Insurance Agency. The company was formed to help petitioner's insurance agent establish his own insurance agency and accordingly was sold to that agent in 1964. In 1962 petitioner joined in the forming of a corporation known as Edina Corporation, of which he was a 33-1/3-percent owner. The corporation applied to the FCC for a radio station in Bloomington, Minnesota. After a hearing before the FCC the application was denied in 1970 and the company thereafter was dissolved. In 1963 petitioner helped form Accounting and Data Processing Corporation, which converted handwritten systems for the reporting of sales receipts, rejections, cash, journal, station log and announcer's log to an IBM card printout system. Petitioner was a 33-1/3-percent owner of this corporation which was sold or dissolved in 1964. In 1965 and 1966 petitioner joined in the forming of two related corporations, American Associates, Inc., and Northwestern Construction Services, Inc. Petitioner's *371 interest in these corporations was sold in 1966. In 1971 petitioner joined in the forming of a corporation known as Castle Watch Security System. Petitioner's interest in this corporation was sold to another shareholder in 1971. In the same year, petitioner joined in the formation of a corporation known as National Metal Cleaning. This corporation was dissolved in 1971. In 1971 petitioner joined as a partner in a venture known as H & J Co. The purpose of the venture was to drill oil wells. Associated with this venture was a proprietorship also formed by petitioner in 1971 known as Tait Gibbs, also formed to drill oil wells. Petitioner disposed of his interest in H & J Co. in 1973 in exchange for stock of an unrelated corporation. Tate Gibbs was unsuccessful in its operations, and petitioner discontinued it in 1973. Also in 1971 petitioner formed a corporation known as Cowen Creek Land & Cattle Corporation. This corporation served as the general partner of several limited partnerships formed for investment in cattle breeding. The limited partnerships were liquidated over a period of years. The corporation also was liquidated with some of its assets being transferred to a *372 proprietorship known as Mora Implement. Mora Implement was formed by petitioner in 1975. Upon its formation, it acquired the farm machinery used by Cowen Creek Land & Cattle Corporation in its operations. Petitioner sold Mora Implement to its manager in 1978. In 1974 petitioner took part in the formation of a corporation known as Universal Communications, Inc. This corporation was liquidated and dissolved in 1976. Beginning in 1974 petitioner decided to shift his attentions to real estate investment. At that time, petitioner purchased two apartment buildings in St. Paul known as 30-42 St. Albans and Grand Avenue Apartment House. These apartments were sold in 1976. Petitioner estimated that from 1963 to 1975, he examined approximately 100 businesses. Of these, he actually became involved, in one manner or another, in 17 new businesses. Between 1957 and 1974 petitioner acquired a controlling interest in 11 corporations: WCMP; KOWB; Roger Dougherty Insurance Agency; American Associates, Inc.; Northwestern Construction Services, Inc.; Gem Lake Properties; General Illumination, Inc.; Castle Watch Security System; National Metal Cleaning; Cowen Creek Land & Cattle Corporation; *373 and Ledco, Inc. He also held noncontrolling interests in a number of other enterprises. Upon disposition of his interest in the 11 corporations in which he held controlling interest, petitioner realized a gain in three instances: WCMP; KOWB; and Roger Dougherty Insurance Agency. [3] In each of the three instances in which petitioner realized a gain from the disposition of his controlling interest in a corporation, he treated that gain as arising from the sale or other disposition of a capital asset. During the period 1957 through 1975, petitioner made three loans or loan guaranties aside from those made to businesses in which he owned a substantial equity interest: KYMN; Duluth Filter (V.O. Law); and E.M. & H.F. Ware Co. In the first such situation, petitioner guarantied *374 a loan to the station manager of KYMN to enable that individual to buy the stock of KYMN from petitioner's children.As a result of the sale of stock, petitioner's children made a profit of approximately $185,000 on the transaction. In the case of Duluth Filter petitioner loaned Mr. V. O. Law $5,500. Mr. Law and petitioner had been close business associates who had worked together developing businesses for purchase at no fee. The loan to E.M. & H.F. Ware Co. again was made to a business associate, petitioner's real estate broker, who aided petitioner in real estate transactions resulting in lower commission rates and other services at no cost. Over the years, during petitioner's activities with respect to the various business ventures described above, petitioner generally did not receive a fee, at least in a traditional fee-paying arrangement, for promoting and developing corporations. General Illumination, Inc. (hereinafter General Illumination) was incorporated by petitioner in 1970 under the laws of the State of Minnesota. At that time, petitioner was the sole shareholder of the corporation. However, by 1973, his ownership interest had shrunk to 54 percent. On March 10, 1970, *375 petitioner executed a guaranty of a loan from the First National Bank of St. Paul to General Illumination in the amount of $115,000. On February 16, 1971, this amount was increased to $150,000. Finally, on June 1, 1971, petitioner secured an additional line of credit from the First National Bank of St. Paul which was not used until December 1972. In the spring of 1972, General Illumination acquired Snowmobile Parts House, which was in the business of selling parts to snowmobile dealers and distributors. To finance inventory purchases for the acquired business, General Illumination borrowed $400,000 from Commercial State Bank as follows: $50,000 on October 13, 1972; $250,000 on October 25, 1972; and $100,000 shortly thereafter. In addition, Commercial State Bank issued a letter of credit in the amount of $40,000 dated May 21, 1973. Petitioner guarantied all of the above loans. In December 1972 General Illumination borrowed an additional $120,000 from the First National Bank of St. Paul. Petitioner guarantied this amount, increasing his total guaranty to this bank to $270,000. On November 13, 1972, petitioner, Patrick M. Landy, and M. D. Price, Jr., executed a guaranty of trade *376 balances due from General Illumination to Flex-O-Glass, Inc. In connection with this guaranty and all guaranties entered by John C. Hunter, Patrick M. Landy and M. D. Price, Jr., petitioner, on October 2, 1972, entered into an Indemnity Agreement whereby he agreed to indemnify Patrick M. Landy and M. D. Price, Jr., under such guaranties. During 1973, petitioner was called upon to honor the guaranty of trade balances due from General Illumination to Flex-O-Glass, Inc. in the amount of $12,649.02. As a result, Flex-O-Glass, Inc. assigned to petitioner its claims against General Illumination and petitioner became subrogated to the rights of Flex-O-Glass, Inc. against General Illumination. During 1973 petitioner executed a guaranty of trade balances due from General Illumination to J.P. Stevens and Company, Inc. During 1973 and 1974 petitioner was required to honor these guaranties in the amount of $4,788.40. Consequently, J.P. Stevens and Company, Inc. assigned petitioner its claim against General Illumination, petitioner became subrogated to the rights of J.P. Stevens and Company, Inc. against General Illumination, and General Illumination executed a note to petitioner as assignee *377 of J.P. Stevens and Company, Inc. [4]
On April 26, 1973, General Illumination and its three subsidiaries, SWS Manufacturing Company, Fix-All, Inc., and Winter Products, Inc., filed a petition under Chapter 11 of the Bankruptcy Act. The proceedings were consolidated and hereafter are referred to only in the name of General Illumination. [5] On January 3, 1974, petitioner honored the First National Bank of St. Paul guaranties by paying the bank an amount totalling $278,662.51. This amount represented a principal amount of $270,000 and interest in the amount of $8,662.51. Upon the payment of this amount by petitioner, the First *378 National Bank of St. Paul assigned its claims against General Illumination to petitioner and petitioner became subrogated to the rights of the bank against General Illumination. General Illumination, in turn, executed a note to petitioner as assignee of First National Bank of St. Paul. The debt owed to Commercial State Bank was paid in its entirety from insurance proceeds received by General Illumination as a result of a fire that destroyed a major portion of the inventory of the company. Prior to payment, petitioner was required to secure his guaranties to Commercial State Bank by a pledge of $200,000 of collateral. On April 8, 1974, a Plan of Arrangement was confirmed for General Illumination in the Bankruptcy Act proceeding referred to above. In accordance with such plan of arrangement, General Illumination executed notes evidencing its obligation to pay petitioner $66,240.64 in connection with the assignments from First National Bank of St. Paul, Flex-O-Glass, Inc., and J.P. Stevens and Company, Inc., the original total of such assignments being in the amount of $287,437.42. In 1974, petitioner received payments under the Plan of Arrangement in the amount of $16,900.54, leaving *379 a balance due and owing to him under such notes in the amount of $49,340.10. The payments under the plan provided an initial payment of 2 percent, which sum was paid out of $40,000 borrowed from the Third Northwestern National Bank of Minneapolis by General Illumination under the Chapter 11 proceedings. No other payments were made by the company pursuant to the Amended Plan of Arrangement and petitioner's net payments under such plan were those as set forth above ($16,900.54). During the period that General Illumination was in Chapter 11 proceedings, petitioner made various advances to General Illumination, pursuant to Certificates of Indebtedness issued by the Bankruptcy Court and secured by the assets of General Illumination, in the total amount of $220,100. These advances were made through monies petitioner obtained from the Commercial State Bank of St. Paul. On August 6, 1975, petitioner obtained judgment against General Illumination in Ramsey County, Minnesota for $73,549.24, representing the appropriate amount of guaranties he had executed on behalf of the corporation. On or about August 12, 1975, petitioner levied execution of said judgment. In addition, petitioner instructed *380 all debtors of General Illumination to make payments directly to petitioner. On petitioner's income tax return for the year 1974, petitioner took a deduction in the amount of $270,537 as a business bad debt resulting from loan guaranties made by petitioner. This deduction was carried back to the taxable year 1971 where it was utilized by petitioner in offsetting taxable income for that year.Respondent, in his notice of deficiency, stated that loan guaranties made to the corporation did not constitute loans but rather were contributions to capital. In the alternative, respondent stated that if it were found that such transfers constituted loans, the debts were nonbusiness bad debts because they were not created in connection with any trade or business. OPINION As we view it, the first issue to be decided is whether the guaranties made by petitioner constituted bona fide debt obligations or whether they instead were contributions to capital. This Court has recognized that advances made in the form of guarantied debt, rather than direct loans, can constitute capital contributions. Smyers v. Commissioner,57 T.C. 189, 198 (1971); Plantation Patterns, Inc. v. Commissioner,T.C. Memo. 1970-182, *381 affd. 462 F.2d 712 (5th Cir. 1972); Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 550 (1968). See also Ellisberg v. Commissioner,9 T.C. 463, 466 (1947). This "substance over form" approach also has been applied by other courts. Casco Bank & Trust Co. v. United States,544 F.2d 528, 534-535 (1st Cir. 1976), cert. denied 430 U.S. 907 (1977); Plantation Patterns, Inc. v. Commissioner,462 F.2d 712, 723 (5th Cir. 1972), affg. a Memorandum Opinion of this Court.
When unscrambling such transactions in this manner, the courts normally have held that the guarantor was the actual borrower of the funds and that such guarantor then contributed the funds to the corporation. Santa Anita Consolidated, Inc. v. Commissioner,supra at 550. Whether guarantied debt is to be treated as an "indirect capital contribution" [6] in this way depends upon a consideration of the facts in light of traditional debt-equity guidelines. Santa Anita Consolidated, Inc. v. Commissioner,supra at 550. In this respect, petitioner bears the burden of proof. John Town Inc. v. Commissioner,46 T.C. 107, 126 (1966), affd. without published opinion (7th Cir. Apr. 28, 1967). Bearing these guidelines in mind, *382 [7] and after a careful consideration of evidence presented, we find that the guarantied loans were in actuality contributions of capital by petitioner to General Illumination. The business initially purchased by General Illumination was bought entirely by funds borrowed by that corporation and guarantied by petitioner. From the evidence before us, the subsequent expansion of the corporation into the snow-mobile business likewise was financed by borrowed monies secured by petitioner's guaranty. Petitioner apparently claims that he made an initial contribution of only $15,000 to the corporation. However, this money came out of the funds borrowed from the First National Bank of St. Paul by General *383 Illumination. Thus, the funds considered by petitioner to be a capital contribution came into the corporation from the same source and by the same means as the guarantied funds and the two cannot be bifurcated for purposes of characterization. Even assuming, however, that the $15,000 was a capital contribution by petitioner, we nevertheless have no trouble in concluding that the guaranties were indirect capital contributions on the ground that General Illumination was undercapitalized. See Plantation Patterns, Inc. v. Commissioner,462 F.2d 712, 722 (5th Cir. 1972); Tyler v. Tomlinson,414 F.2d 844, 848 (5th Cir. 1969). The fact that the likelihood of repayment of the debt by the corporation was tied to the success of the corporate obligor is also indicative that the debt was in reality venture capital.See Gilbert v. Commissioner,248 F.2d 399, 407 (2d Cir. 1957), remanding a Memorandum Opinion of this Court. This is due to the fact that any business loss of the corporation would result in an inability to pay off its corporate obligations with its capital base. Thus, such payments would have to be paid either by additional borrowing or by the guarantor of the corporate obligations, *384 as was eventually the case here. Finally, as we stated above, petitioner's confusion as to the rightful owner of the borrowed funds facilitates our finding. Upon being asked whether his $15,000 capital contribution was received by him as part of the First National Bank loan, petitioner replied that it was the remainder of the loan that he considered to be a corporate obligation.Petitioner was then asked whether he had any equity in the corporation. He stated that he had $115,000 of his own money in the corporation. This $115,000 was a debt of General Illumination guarantied by petitioner. Thus, petitioner's statements reveal his confusion with respect to the nature of the financing of the corporation. His confusion ends here.The guaranties were capital contributions. [8] *385 Having found that the purported guarantied loans were actually indirect capital contributions by petitioner, it is unnecessary for us to decide whether General Illumination's debts, to which petitioner was subrogated, became wholly worthless at any time prior to December 31, 1974 for purposes of section 166(a)(1). [9] However, the timing of petitioner's deduction remains at issue. If we find, as petitioner insists we must, that he was engaged in the trade or business of developing and promoting corporations, then any loss incurred by petitioner on his "stock" in the corporation is deductible under section 165(a) in the year sustained. The loss would be ordinary since such "stock" would be excluded from the definition of a capital asset under section 1221(1)[10] and therefore would not be governed by section 165(g). [11] If we find that petitioner was not so engaged, then his loss on his "stock" in the corporation is governed by section 165(g). *386 See Murphy Logging Co. v. United States,239 F.Supp. 794 (D. Ore. 1965), revd. on other grounds 378 F.2d 222 (9th Cir. 1967). [12]
Section 165(g)(1) provides that: SEC. 165. LOSSES (g) Worthless *387 Securities.-- (1) General Rule.--If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. The mere fact that actual "securities" were not issued to petitioner does not vitiate the thrust of section 165(g) in view of our holding that in substance petitioner made capital contributions to General Illuminatioin. See Gawler v. Commissioner,60 T.C. 647, 655 (1973), affd. 504 F.2d 425 (4th Cir. 1974); Idol v. United States, an unreported case ( S.D. Cal. 1956, 51 AFTR 1182, 56-1 USTC par. 9384). [13]
Petitioner alleges that the number and frequency of his stock purchases and dispositions in various enterprises over the years, coupled with his activities with respect to the enterprises, elevate his overall activities, when viewed as a composite whole, to the level of a trade or business. We disagree. In Whipple v. Commissioner,373 U.S. 193, 202 (1963), *388 the Supreme Court stated: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission * * *389 * but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise * * *. In Deely v. Commissioner,73 T.C. 1081, 1093 (1980), we interpreted Whipple v. Commissioner,supra, to say that, in order for petitioner to be in the separate trade or business of promoting, organizing, financing and dealing in corporations, his activities must be conducted for a fee or commission or with the purpose of immediately selling the corporations at a profit in the ordinary course of that business. The return that petitioner seeks from his activities must be "other than the normal investor's return" and must be "received * * * directly for his services rather than indirectly through the successful operation of the corporate enterprise." Deely v. Commissioner,supra at 1093. When considered in light of this standard, we do not believe that petitioner's activities with respect to General Illumination constituted activities in the trade or business of developing and promoting corporations. The facts reveal that petitioner, as a general rule, did not receive a fee or commission for his *390 efforts. See Millsap v. Commissioner,46 T.C. 751, 756 (1966), affd. 387 F.2d 420 (8th Cir. 1968). His expected return was that of any traditional investor: gain accruing to the taxpayer as a result of an increase in the value of his investment. Whipple made it clear that the fact that such increase is produced by the taxpayer's personal efforts does not alter the character of the transaction. In Deely v. Commissioner,supra, at 1094-1095, we considered the duration of the taxpayer's ownership in those corporations which were sold for a profit to determine whether the taxpayer had an intention to dispose immediately of the corporations. In the instant case, only three of the corporations in which petitioner had a controlling interest were sold by petitioner for a profit. These three, WCMP, KOWB and the Roger Dougherty Insurance Agency, were sold after 7 years, 3 years and 2 years, respectively, clearly not quick resales. [14] Petitioner reported the gain on the sales as capital gain, rather than ordinary income as would be the case if the sales were in the ordinary course of petitioner's trade or business. When faced with a gain we find it enlightening and significant that even *391 petitioner viewed himself as an investor. See Deely v. Commissioner,supra at 1095; Millsap v. Commissioner,supra at 757; Rollins v. Commissioner,32 T.C. 604, 616 (1959), affd. 276 F.2d 368 (4th Cir. 1960). Because petitioner's activities with respect to General Illumination were not in furtherance of an alleged trade or business of promoting or developing corporations, petitioner's "stock" in that corporation was a capital asset as defined by section 1221. From this, it follows that any loss taken by petitioner as a result of the worthlessness of such stock must be governed by section 165(g). This leaves one final issue to be resolved, namely, whether the stock did in fact become worthless during the year in question, 1974. However, in order to reach this issue, *392 we first must determine whether it was timely raised by respondent. Respondent did not raise the issue in his notice of deficiency, in the examiner's report, or in the pleadings of the case. Although petitioner elicited testimony with respect to the timing of the worthlessness of his "bad debt" during trial, petitioner argues that the year of loss is a "new matter" which is not properly before the Court. Respondent, on the other hand, contends that the issue does not constitute a new matter and properly can be raised as an alternative defense. Respondent asserts that the issue of the timing of the deduction is one of the elemental facts that petitioner must establish in order to be entitled to the deduction, and therefore that the raising of the general issue of the character of the deduction carries with it by implication a challenge to the timing of petitioner's deduction. [15]
We see the matter differently. Respondent's attack was aimed at the character of the loss, not at its timing. In such case, the issue of the timing of the loss would appear to be conceded, for if the loss was not properly taken in the year *393 before the Court, the issue of the character of the loss becomes moot. In short, we do not accept the proposition that a challenge to the ordinary character of a loss necessarily encompasses a challenge to the fact of the loss.
This Court ordinarily will not decide issues which are different from or inconsistent with the statutory notice unless they are raised in the pleadings or by an amendment to the pleadings. Fox Chevrolet v. Commissioner,76 T.C. 708, 733-734 (1981); Estate of Goldsborough v. Commissioner,70 T.C. 1077, 1085-1086 (1978), affd. 673 F.2d 1310 (4th Cir. 1982); Markwardt v. Commissioner,64 T.C. 989, 997 (1975); Estate of Horvath v. Commissioner,59 T.C. 551, 556 (1973). A limited exception sometimes is applied where it is found that the taxpayer received advance notification sufficient to allow him adequately to prepare for trial. See Schuster's Express, Inc. v. Commissioner,66 T.C. 588, 593-594 (1976), affd. without published opinion, 562 F.2d 39 (2d Cir. 1977); Rubin v. Commissioner,56 T.C. 1155, 1163-1164 (1971), affd. 460 F.2d 1216 (2d Cir. 1972). Although the relevant facts and legal arguments were not extensively presented by the parties, we do not *394 believe that the exception applies in this case. Proving that a debt or stock became worthless in a given year is a difficult task, not only because it requires the proving of a negative but in addition because establishing the time that property passes from a virtual worthlessness to absolute worthlessness is a nebulous matter at best. The taxpayer must be prepared to confront any and all possible arguments that some value remained in the debt or stock at the end of the taxable year in question. Failure to do so will result in the loss of the claimed deduction for the year in question. Because of the difficulty in ascertaining the year of loss in the case of bad debts and worthless stock, section 6511(d) allows a 7-year period of limitations in such instances. The difficulty was acknowledged early by Judge Augustus Hand in Young v. Commissioner,123 F.2d 597, 600 (2d Cir. 1941), wherein he stated that: In cases like this the taxpayer is at times in a very difficult position in determining in what year to claim a loss. The only safe practice, we think, is to claim a loss for the earliest year when it may possibly be allowed and to renew the claim in subsequent years if there is *395 any reasonable chance of its being applicable to the income for those years. In order for respondent to put petitioner to his proof with respect to the timing of the deduction at issue, respondent must give petitioner ample notice of his intention to do so. Elemental fairness requires no less. On the facts before us, we hold that the issue was not properly and timely raised. We will not consider it. Decision will be entered under Rule 155.
Footnotes
1. During this time, KOWB applied for and built a radio facility in Wheatland, Colorado.↩
2. KIMN purchased a radio station in 1964 in Portland, Oregon. An attempt to sell the Portland station fell through in 1967 due to an FCC decision, and the station eventually was sold in 1971 along with KIMN.
3. Upon disposition of his interest in the nine businesses in which he held less than a controlling interest or which were not in corporate form, petitioner realized a gain in six instances: KIMN, General Broadcasting, Accounting and Data Processing, H & J Co., Tate Gibbs, and Mora Implement. Petitioner's interest in each of these ventures was held for 11 years, 13 years, 1 year, 2 years, 2 years and 3 years, respectively.↩
4. On Dec. 1, 1972, petitioner, Patrick M. Landy and M. D. Price, Jr. signed a guaranty for Fix-All, Inc. (a wholly owned subsidiary of General Illumination) with the Third Northwestern National Bank in the amount of $50,000. Notes were executed on Jan. 5, 1972 for $10,000, Dec. 5, 1972 for $20,000 and Mar. 3, 1973 for $20,000. These were paid by petitioner in 1973 and are not in controversy herein.↩
5. The financial statements for General Illumination and its wholly owned subsidiaries as of March 31, 1973 and March 31, 1974 indicate only $15,087 of paid-in capital.↩
6. Such contribution is measured not by the amount of the guaranty, but by the amount ultimately paid into the corporation by petitioner in satisfaction of his guaranty.↩
7. For a summary of these guidelines see Plantation Patterns, Inc. v. Commissioner,T.C. Memo. 1970-182, affd. 462 F.2d 712 (5th Cir. 1972); Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 551-555 (1968); John Town, Inc. v. Commissioner,46 T.C. 107, 127↩ (1966), affd. without published opinion (7th Cir. Apr. 28, 1967).
8. We note that since the debt transactions are treated as if the loans were made directly to petitioner, who then in turn contributed the funds to the corporation, any accrued interest paid by petitioner on the loans is deductible by him under section 163, I.R.C. 1954. We also note that we have made no attempt to bifurcate the guarantied loans into part debt and part equity. Our hesitation to do so is a product of the scarcity of evidence allowing such a determination and by the "all-or-nothing" treatment adopted by the courts in this area. See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 4.02, p. 4-7 (4th ed. 1979).
9. Because we have found that petitioner's guaranty was in substance a capital contribution, the rule in Putnam v. Commissioner,352 U.S. 82, 85↩ (1956), that "the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt" is not reached. 10. Sec. 1221(1) provides as follows: SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩
11. See Katz v. Commissioner,T.C. Memo. 1960-200↩. 12. See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 4.10, p. 4-42 (4th ed. 1979).↩
13. See also Bittker and Eustice, supra at par. 4.10, p. 4-42.See also Carroll v. Commissioner,T.C. Memo. 1971-59; Becher v. Commissioner,T.C. Memo. 1963-250↩.
14. KIMN, in which petitioner held 33-1/3-percent ownership, was sold for a profit after 11 years of ownership. Other profitable ventures in which petitioner held less than a controlling interest or which were not in corporate form were General Broadcasting, held for 13 years; Accounting and Data Processing, held for 1 year; H & J Co., held for 2 years; Tate Gibbs, held for 2 years; and Mora Implement, held for 3 years.↩
15. Respondent cites Hudspeth v. Commissioner,T.C. Memo. 1972-253↩.