FRANK L. FARRAR AND PATRICIA J. FARRAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Farrar v. Commissioner
Docket No. 7258-85
United States Tax Court
T.C. Memo 1988-385; 1988 Tax Ct. Memo LEXIS 398; 55 T.C.M. (CCH) 1628; T.C.M. (RIA) 88385; August 16, 1988; As amended August 16, 1988 Danny R. Smeins, for the petitioners. Robert F. Cunningham, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioners' Federal income tax for taxable year 1979 in the amount of $ 107,481.77, and an addition to tax in the amount of $ 26,870.44 pursuant to section 6651(a)(1). [1] After concessions, the issues remaining for decision are as follows: (1) whether petitioners may fully deduct, as business bad debts, payments *400 made pursuant to personal guaranties of loans to certain entities, (2) whether advances to one of those entities are so deductible, and (3) whether petitioners are liable for an addition to tax under section 6651(a)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits to which reference is made therein are incorporated herein by reference. Petitioners Frank L. Farrar and Patricia J. Farrar were residents of Britton, South Dakota, when they filed their petition. Petitioners filed their income tax return for 1979 with the Service Center at Ogden, Utah, on February 18, 1981, although a series of extensions of time to file required that a return be filed by October 15, 1980. Petitioner Frank L. Farrar ("petitioner") is an attorney who has been involved in various businesses, including real estate, insurance, and banking. Since 1965, petitioner has purchased and sold at least 31 banks *401 and insurance agencies, as well as other businesses and parcels of real estate. The following table sets forth the banks and insurance agencies bought and sold by petitioner since 1965 and the length of time each was held: Name of Bank or
Year
Year
Years
Insurance Agency
Purchased
Sold
Held
Citizens State Bank
1965
1978
13
Citizens insurance Agency
1965
1979
14
Peoples State Bank
1965
1977
12
Hallock State Bank
1971
1972
1
304 Corporation
1971
1975
4
Exchange State Bank
1971
1975
4
Anita State Bank
1972
1977
5
Calumet State Bank
1972
1977
5
Calumet Investment Company
1972
1980
8
First Insurance Agency
1972
1982
10
First Insurance -- Beresford
1972
1979
7
First National Bank of Lennox
1973
1982
9
Union Story Trust
1974
1984
10
Winger Insurance Agency
1975
1976
1
First National Bank
1975
1975
0
Farmers State Bank
1975
1979
4
City National Bank
1975
1986
11
City Insurance Agency
1975
1981
6
Carlton Agency
1975
1981
6
Carlton National Bank
1975
1986
11
Veblen Insurance Agency
1978
1985
7
Bank of Veblen
1978
1985
7
Reliable Insurance Agency
1978
1981
3
Bank of Jackson
1979
1981
2
Park Falls State Bank
1980
1986
6
Bank of Waupaca
1981
1984
3
Union National
1981
1983
2
Bank of Lisbon
1982
1983
1
Bank of Cameron
1982
1984
2
Bank of Herrington
1983
1985
2
Bank of Bourbonnais
1983
1986
3
*402 The following table sets forth the same information for interests in other types of businesses bought and sold by petitioner since 1967: Year
Year
Years
Business
Purchased
Sold
Held
Frank's Red Owl
1967
1984
17
(Retail Grocery)
Lake Okoboji
1971
1974
3
Amusements
(Amusement Park)
Sioux Falls Shopper
1971
1974
3
(Newspaper)
Union Credit (Finance
1972
1973
1
Business)
P.C. Harley-
1977
1983
6
Davidson (Golf
Cart Franchise)
Rockford Holiday
1978
1980
2
Inn (Motel)
Yamaha Golf Car
1978
1979
1
Center (Golf
Cart Franchise)
Suther Oil
1978
1980 2
Company
(Petroleum
Dealer)
The following table sets forth the same information for parcels, including farms and other income-producing real estate, bought and sold by petitioner since 1960: Year
Year
Years
Parcel
Purchased
Sold
Held
J.C. Penney Building
1960
1972
12
Vietmeir Farm
1963
1972
9
Butler Building
1963
1973
10
Campbell Land
1964
1974
10
Roney Land
1965
1975
10
Sandbakken Land
1966
1975
9
Peter Kappes Land
1967
1971
4
Rensink Land
1967
1975
8
Siem Lot
1969
1972
3
Woodward Farm
1969
1972
3
Ag-Service Building
1978
1985
7
Hastings Land
1980
1983
3
*403 Petitioner has been qualified to testify as an expert witness with respect to the buying and selling of banks. Petitioner is contacted regularly by Federal and State banking regulators and asked to consider the purchase of troubled banks. On average, petitioner reviews the financial statements of 15 banks a month, evaluating the banks for possible purchase rehabilitation, and resale at a profit. As his approach to rehabilitating ailing banks, petitioner replaces management with his own trained managers. When he purchased the banks set forth in the table above, petitioner paid between zero and 25 percent of the purchase price in cash. The balance of the purchase price was borrowed, and petitioner executed a personal guaranty of the debt, when needed. [2]
Petitioner derives income from selling banks at a profit and earns management fees from banks in which he has an interest, as well as from independent institutions. Those fees, at the time of trial, amounted to approximately $ 750,000 per year. Increasingly restrictive *404 regulation made the sale and transfer of banks more difficult, causing petitioner to begin purchasing other businesses. In 1976, petitioner formed CFB, Inc. ("CFB"), and received all of its capital stock. CFB acquired promptly an existing bottling business in Albuquerque, New Mexico. In 1978, Francis Graham acquired a 20 percent interest in CFB and became president of the company. Also in 1979, petitioners executed a continuing guaranty in favor of the First National Bank of Albuquerque (the "bank") of up to $ 600,000 of loans made to CFB by the bank (the "bank guaranty"). As security for the bank guaranty, petitioners pledged certificates of deposit they held personally. On October 3, 1978, petitioner and CFB also executed, as co-makers, a note in favor of the bank in the amount of $ 350,000. In 1979, petitioners were required to surrender $ 165,008.89 in pledged certificates of deposit pursuant to the bank guaranty, and petitioner paid $ 31,500 of interest due from CFB. Prior to 1979, petitioner had paid various debts on behalf of CFB and had advanced sums needed to meet CFB's operating expenses. Those advances were treated by petitioner as loans to CFB, and, in 1979, *405 petitioner charged off as uncollectible $ 162,773.97 of debt resulting from those loans. On December 11, 1979, CFB filed a petition for relief under Chapter 7 of the Bankruptcy Code. In 1976, petitioner bought 75 percent of Dayton Tire Sales Company ("Dayton"). In 1978, petitioner purchased the remaining interest from an associate who had managed the business. In 1979, petitioner paid on behalf of Dayton a $ 28,000 premium due on a fire and casualty insurance policy. In 1980, Dayton ceased doing business and was liquidated. In 1977, P.C. Harley-Davidson Limited (the "partnership") was organized as a limited partnership. Petitioner acquired an 85 percent interest in the partnership as a limited partner. In 1978, petitioner purchased the 10 percent interest of the only other limited partner, Thomas Cummings. P.C. Harley-Davidson, Inc. ("Harley, Inc."), held the remaining five percent interest as general partner. [3]
In 1977, the partnership acquired a golfcart distributorship, allowing the partnership to sell golfcarts manufactured by Harley-Davidson Motor Company ("Harley-Davidson"). The partnership then acquired a *406 franchise allowing it to sell Yamaha golfcarts. Petitioners executed a continuing guaranty of any debt to Harley-Davidson guaranty"). In September of 1977, the partnership gave Harley-Davidson a $ 500,000 note, which the limited partners, including petitioner, guaranteed. During 1979, petitioner was required to pay Harley-Davidson $ 26,326.20 pursuant to the Harley-Davidson guaranty. Harley, Inc., became indebted to Ranier National Bank ("Ranier"). On January 10, 1978, the partnership and each of its limited partners, including petitioner, executed a guaranty of that debt (the "Ranier guaranty"). During 1979, petitioner was required to pay $ 23,505.10 to Ranier pursuant to the Ranier guaranty. Thus, petitioners have paid $ 359,282.86 to or on behalf of CFB, [4] $ 28,000 on behalf of Dayton, $ 26,326.20 on behalf of the partnership, and $ 23,505.10 on behalf of Harley, Inc.
OPINION Respondent contends that payments to and on behalf of CFB, *407 the partnership, and Harley, Inc., are nonbusiness bad debts, deductible as short term capital losses under section 166(d)(1) and that the payment on behalf of Dayton is nondeductible. Petitioner contends that all payments are business bad debts that are fully deductible under section 166(a)(1). [5] The issue is one of fact. Sec. 1.166-5(b), Income Tax Regs.
Section 166(a)(1) supplies the general rule permitting the full deduction of worthless debts, while section 166(d)(1) characterizes losses from "nonbusiness" debts as short term capital *408 losses. Section 166(d)(2) defines a "nonbusiness debt" as "a debt other than--(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayers; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Both parties place much reliance on Whipple v. Commissioner,373 U.S. 193 (1963). In Whipple, the Supreme Court held that the taxpayer's advances to one of a number of corporations he owned did not result in business bad debts, as the advances were not sufficiently related to the taxpayer's trade or business (as opposed to the trade or business of the taxpayer's corporation). Respondent relies on the following excerpt from Whipple:
Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing * * * Where the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating *409 that he is engaged in a trade or business since investing is not a trade or business * * *. [Emphasis supplied; 373 U.S. at 202.] Petitioners also quote from Whipple, as follows: the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, * * * or for a profit on their sale, * * * but in such cases there is compensation other than the normal investor's return * * *. [373 U.S. at 202-203.] Petitioner asserts that he is in the trade or business of promoting businesses and that the payments and advances at issue are related proximately to that business. Respondent's principal argument is that the payments and advances made by petitioners could not be related proximately to the trade or business of promoting because petitioner had no expectation of realizing anything other than a profit on the sale of the businesses. Respondent suggests that a taxpayer must earn some sort of fee or commission to be engaged in the business of promoting. We reject respondent's interpretation of Whipple. The Supreme Court clearly stated *410 in Whipple that promoters may work for "a fee or commission, * * * or for a profit on their [businesses'] sale." (Emphasis supplied.) 373 U.S. at 202. Furthermore, in Deely v. Commissioner,73 T.C. 1081, 1093 (1980), we stated that the separate trade or business of promoting businesses "must be conducted for a fee or commission or with the immediate purpose of selling the corporations at a profit in the ordinary course of business." In Deely, we cited Giblin v. Commissioner,227 F.2d 692 (5th Cir. 1955), for the proposition that developing and selling businesses for profit is a trade or business, stating as follows: To fall within the rule established in Giblin, petitioner must show that the entities were organized with a view to a quick and profitable sale after each business had become established, rather than a view to long-range investment gains. * * * [73 T.C. at 1093.]
Thus, in Deely we made it clear that buying and selling businesses for profit may constitute a trade or business even though, as in the instant case, a promoter does not receive a fee, commission, or other "non-investor" *411 compensation. Based upon the record in this case, we find that petitioner was engaged in the trade or business of developing and promoting businesses. We base this conclusion upon the fact that since 1965, petitioner has bought and sold at least 31 banks and insurance companies, as well as other businesses and income-producing real estate. Further, while the focus of his business may have been banks, petitioner did not limit his business to the banking industry. His substantial "track record" makes it clear that he is a promoter of businesses rather than a mere investor. We also find, based upon the record in the instant case, that petitioner's payments to or on behalf of CFB, the partnership, and Harley, Inc., were related proximately to petitioner's trade or business of promoting, because petitioner acquired his interests in CFB and the partnership with the intention of developing these businesses and selling his interests at a profit once the businesses became established. We base our finding upon the fact that petitioner used essentially the same approach in his attempt to profit from the sale of banks and those businesses. Specifically, petitioner trained bank managers *412 and contemplated selling banks to those local managers as the banks became viable. He took a similar approach with CFB, the partnership, and Dayton. [6] With respect to CFB, petitioner made Francis Graham a 20-percent shareholder and president of the company. Petitioner testified and we find that he anticipated a sale of his interest to a group headed by the management of CFB, most likely Francis Graham. With respect to Dayton, an associate of petitioner held a 25 percent interest in Dayton. Petitioner's testimony shows that he contemplated either selling Dayton stock once the company had increased in value. As to the partnership, Thomas Cummings initially held a 20-percent limited partnership interest in this firm. Although not clear from the record, Thomas Cummings may well have been a potential buyer of the business. In sum, petitioner orchestrated the development of CFB and the partnership for sale as if these entities were banks or other businesses he held for sale in the ordinary course of his business. *413 Further, for each of the three businesses involved in the instant case, petitioner had a plan aimed at earning a profit through the sale of the business. He testified and we find that he formed CFB in order to purchase an existing bottling business and increase its value by expanding its service area and product line. Similarly, petitioner's testimony shows that he bought Dayton with the intent of increasing its worth by acquiring additional retail tire outlets. [7] Finally, petitioner offered credible testimony that he would develop the golfcart distributorship of the partnership by acquiring an additional franchise. In fact, a franchise to sell Yamaha golfcarts was obtained, although this apparently did not render the partnership profitable. Petitioner's testimony reveals that he viewed CFB and the partnership as capable of quick appreciation given the proper management and financing, which he intended to supply. We are convinced, based upon the record as a whole, that petitioner did not acquire or hold CFB and the partnership as long-term investments. Petitioner sold other businesses he acquired when he was able to do so. He also retained *414 several businesses that he was unable to sell. The mere fact that a taxpayer who is engaged in the business of buying and selling businesses is not able to sell all of his "inventory" should not, alone, militate against a finding that the taxpayer is engaged in such a trade or business. Similarly, the fact that CFB and the partnership never became sufficiently established to sell at a profit does not, alone, cause us to conclude that petitioner was a mere investor in those businesses, looking only for capital appreciation. The above-quoted language from Deely indicates that a developer of a business should be allowed a period of time to rehabilitate an ailing business or to establish a newly acquired business before the length of time that the business is held becomes determinative of the issue of whether the developer's return is from his services or is indirectly received from the successful operation of the business. Because the businesses at issue in the instant case were not successful, we do not know if petitioner would have held them any longer than he did, had they been rehabilitated. Petitioner does have, however, a track record with respect to the other businesses *415 that he has bought and sold. Petitioner, with respect to his most recently acquired businesses, sold them soon after they were acquired. [8] That fact indicates to us that petitioner was not merely an investor looking for long-term appreciation. If petitioner were an investor, he likely would have held on to his successful investments. We also believe that had CFB and the partnership turned out to be successful, petitioner would have disposed of his interests in accordance with his overall plan of turning a quick profit as soon as a business was established or rehabilitated. *416 Clearly, advances to CFB, as well as payments satisfying guaranties of debts to CFB, the partnership, and Harley, Inc., were related "proximately" to petitioner's business, insofar as financing those entities was necessary for the rehabilitation and ultimate sale of CFB and the partnership. Further, petitioner testified that his failure to honor a personal guaranty would put him out of business. Thus, petitioner extended credit to CFB, the partnership, and Harley, Inc., in order to protect his business. A bad debt is related proximately to a taxpayer's trade or business if such taxpayer has a "dominant business motive" in making a loan. United States v. Generes,405 U.S. 93, 103 (1972). Respondent relies upon a number of cases finding that taxpayers were not engaged in the business of promoting companies. We read those cases in light of the admonition that the question of whether a taxpayer's activities constitute a trade or business depends upon the facts and circumstances of each case. Commissioner v. Groetzinger,480 U.S. 23 (1987). While there are an ample number of cases holding against taxpayers on the issue, to blindly refuse to acknowledge *417 that a taxpayer is in the trade or business of promoting would be to adopt a per se rule that is not supported by Whipple or its progeny. The cases relied upon by respondent are distinguishable from the instant case. In Deely, the taxpayer quickly abandoned or sold 11 unprofitable companies. Of 16 profitable companies, he held 7 for more than 13 years, and an additional 6 entities sold for profit were held from 17 to 39 years. 73 T.C. at 1094. We noted a manifest intent to quickly dispose of losing companies, while retaining profitable ventures, earning an investor's return, i.e., dividends. 73 T.C. at 1095. In contrast, petitioner held the 31 banks and insurance agencies he sold for periods ranging from less than one year to 14 years. Sixteen of those entities were held for five years or less. Most significantly, the businesses held longest by petitioner were unprofitable and, thus, unmarketable. This fact belies any suggestion that petitioner retained profitable ventures for the long-term appreciation or dividends that an investor seeks. In *418 United States v. Clark,358 F.2d 892 (1st Cir. 1966), cert. denied 385 U.S. 817 (1966), the court found "no evidence whatever" of an intent to develop one company for sale, and that guaranties of another corporation's debts were made to enhance the value of stock options held by the taxpayer and to protect the investment of friends. 358 F.2d at 895-896. In the instant case, petitioner produced evidence of his intent to develop CFB and the partnership: CFB's service area and product line were to be expanded, and the Yamaha golfcart franchise was obtained. Further, in light of petitioner's track record, we conclude that those and other efforts were not designed merely to protect investments. Rather, they were designed to make entities marketable. In Townshend v. United States,384 F.2d 1008 (Ct. Cl. 1967), the court rejected the taxpayer's argument that he was in the trade or business of developing companies for sale, stating, "During the entire twenty years covered by his testimony, plaintiff never once sold any corporation in which he had an interest." *419 384 F.2d at 1013. In Smith v. Commissioner,62 T.C. 263, 269 (1974), we found a lack of "tangible evidence of any effort to promote and sell these corporations to customers." Millsap v. Commissioner,46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968), and Schwartz v. Commissioner,T.C. Memo. 1964-247, also were decided on their facts and are likewise distinguishable. In Millsap, we found no evidence that the taxpayer had "organized the corporations he did with a view to quick and profitable sale after each business had become established." 46 T.C. at 757. In Schwartz, we noted that only "self-serving testimony" supported the taxpayer's assertion that he was engaged in the business of promoting corporations for sale to others. Finally, respondent cites Townshend, supra, and Vreeland v. Commissioner,31 T.C. 78 (1958), for the proposition that advances to or payments on behalf of CFB and Harley, Inc., cannot result in business bad debts, as petitioner held no direct interest in those entities. *420 Even though petitioner held no interest in Harley, Inc., and assuming, arguendo, that CFB was placed in a holding company after CFB was formed, we disagree with respondent's contention. Those cases merely support the uncontrovertible tenet that a corporation's business must be considered separate from that of its shareholder and that, therefore, a corporation's promotional activity cannot be attributed to its shareholder. In Vreeland, for example, we refused to find that a taxpayer was in the trade or business of promoting, noting that "petitioner was working for and otherwise connected with corporations which were themselves in the business of promoting and financing other enterprises." 31 T.C. at 82. We therein labelled the taxpayer's own promotional activities as "sparse and infrequent." 31 T.C. at 83. Clearly, if a taxpayer is employed by a corporation which promotes businesses, it is the corporation alone which is in the trade or business of promoting. Yet, in the instant case, petitioner personally promoted businesses. Further, petitioner caused CFB to be incorporated and likewise formed the partnership. Those were petitioner's personal projects, *421 as opposed to the projects of holding companies such as those involved in Vreeland.
Based upon the foregoing, we find that the advances to and payments on behalf of CFB, the partnership, and Harley, Inc., were made with respect to petitioner's business of developing and promoting businesses. We therefore hold that petitioners are entitled to deduct those advances and payments as business bad debt deductions under section 166(a) in taxable year 1979. With respect to the $ 28,000 insurance premium which petitioner paid on behalf of Dayton, petitioners have offered no proof that such payment was made pursuant to a guaranty or that it in any other way created a creditor-debtor relationship between petitioner and Dayton or if it did, that the debt became worthless during the year in issue. Thus, section 166 does not authorize the deduction. Nor can the amount be deducted under section 162, as the premium was not an "ordinary and necessary" expense of petitioner's trade or business, although it may have qualified as such if paid by Dayton. *422 Vreeland v. Commissioner,31 T.C. at 82. Petitioners have failed to meet their burden of proof with respect to the deduction for the premium payment. Rule 142(a).
Petitioners bear the burden of proving that the addition to tax does not apply. Foy v. Commissioner,84 T.C. 50 (1985); Abramo v. Commissioner,78 T.C. 154, 163 (1982). No evidence whatsoever has been offered of "reasonable cause" for the untimely filing of petitioners' 1979 return, and petitioners do not argue the issue on brief. We treat the issue as conceded, and petitioners therefore are liable for addition to tax under section 6651(a)(1). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless other indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Presumably, although not clear from the record, the primary obligors of these obligations are holding companies used by petitioner to acquire banks. ↩
3. Petitioner held no interest in Harley, Inc.↩
4. This figure is comprised of the $ 165,008.89 in surrendered certificates of deposit, the $ 31,500 of interest paid pursuant to the bank guaranty, and the $ 162,773.97 of loans charged off by petitioner as business bad debts. ↩
5. Initially, we note that the payments in issue are deductible, if at all, as bad debts. Petitioners' opening brief suggests that portions of the amounts paid to creditors may be deducted as interest. Yet, section 1.166-9, Income Tax Regs., states that "Neither section 163 (relating to interest) nor section 165 (relating to losses), shall apply with respect to such a payment [pursuant to a guaranty of another's obligation]." Rather, such payments are governed by section 166 on the theory that the payment causes the guarantor to be subrogated to the rights of the creditor. Putnam v. Commissioner,352 U.S. 82, 85↩ (1956). 6. Dayton is mentioned here only to illustrate the nature of petitioner's approach to his business. The payment on behalf of Dayton is addressed later in this opinion. ↩
7. See preceding footnote. ↩
8. In Hunter v. Commissioner,T.C. Memo. 1982-381, we said that sales after 2, 3, and 7 years were "clearly not quick resales." The facts of that case, however, were such that we held that the taxpayer's advances were capital contributions. Respondent does not assert in the instant case that the advances were capital contributions. In any case, the length of the holding period was only one factor in Hunter and was not the only negative factor weighing against the taxpayer. Further, if we look only to the length of holding periods to determine whether a taxpayer is in the trade or business of promoting, we would be ignoring our opinion in Deely,↩ which suggests that we should look at the length of time businesses were held after they became established.