T.C. Memo. 2001-61

UNITED STATES TAX COURT

FREDERICK H. JACKSON III AND PAMELA S. JACKSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11045-98.                    Filed March 13, 2001.

        R denied P deductions for his pro rata share of
the losses of an S corporation on the grounds that P
had insufficient adjusted basis in his S corporation
shares.  See sec. 1366(d)(1), I.R.C.  P argues that
the corporation lacked borrowing power and his guaranty
of loans to the S corporation should be deemed to
signify his borrowing of the loan proceeds and
subsequent contribution of those proceeds to the
capital of the S corporation, which would increase his
adjusted basis sufficiently for him to deduct the
losses in question.
        <u>Held</u>:  P has failed to prove that the indebtedness
in question was not indebtedness of the S corporation;
therefore, P has failed to prove that he had sufficient
adjusted basis to deduct the S corporation losses in
question.

Edward P. Phillips and Linda L. Snelling, for petitioners.

Reginald R. Corlew, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency dated March 23, 1998 (the notice), respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1994 | $6,057 |
| 1995 | 5,786 |
| 1996 | 8,038 |

Petitioners are husband and wife who, for the tax (calendar) years here in issue, made a joint return of income.  During such years, petitioner husband (petitioner) was a shareholder in an "S corporation", as that term is defined in section 1361(a).  The issue for decision is whether, on account of petitioner's guaranty of certain indebtedness of that corporation, petitioner's adjusted basis in his stock of the corporation exceeded zero.  If it did, then petitioner would be entitled to deduct some or all of his pro rata share of the losses of the corporation.  For the reasons that follow, we find that, despite such guaranty, petitioner's adjusted basis in his stock did not exceed zero.  Therefore, petitioner cannot deduct the losses in question.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and

all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

Residence

At the time of filing the petition, petitioners resided in Wellington, Florida.

The Corporation

The corporation in question is Palm Beach Furniture Co., Inc., a Florida corporation (the corporation). The corporation is a calendar-year taxpayer.

The Bank

Monroe Bank and Trust (the bank) is an institution whose address is in Monroe, Michigan.

The Loan Agreement

By agreement dated October 28, 1994 (the loan agreement), the bank agreed to lend the corporation $1.2 million (the loan). Among other things, the loan agreement provides that the term of the loan is 6 years, the interest rate is 8 percent, and approximately $250,000 of principal will be repaid during the loan term (leaving a principal balance of $947,835.50 to be paid at maturity). The loan agreement also provides:

> This loan is secured by a real estate mortgage dated 10/28/94 on property located in Palm Beach County, Florida and commonly known as 6500 N. Federal Hwy., Boca Raton [(the mortgaged property)]. A Guarantee dated 8/19/94 from Frederick H. Jackson and F. H. Jackson.
>
> ASSUMPTION POLICY: We will not permit an assumption unless required to by law.

The loan agreement is signed "Palm Beach Furniture Company, Inc., Richard McKale, President" (with Mr. McKale's signature).

The Construction Agreement

A document entitled "Construction Loan Agreement" (the construction agreement) was executed by the bank and the corporation simultaneously with the loan agreement. It provides that the proceeds of the loan will be used to erect a furniture showroom in Palm Beach County, Florida. Among other things, the construction agreement provides that the loan will be secured by a mortgage and security agreement on the premises to be constructed and the personal property thereon.

The Mortgage

A document entitled "Commercial Real Estate Mortgage" (the mortgage), relating to the mortgaged property and mortgaging that property to the bank, was filed with, and recorded by, the Clerk, Palm Beach County, Florida, on October 31, 1994. Among other things, the mortgage provides: "This mortgage, together with all other instruments evidencing or securing the Indebtedness, or any

part thereof, shall be governed by and construed in accordance with the laws of the State of Florida".

The Guaranty

By an agreement dated October 28, 1994 (the guaranty agreement), petitioner and his father, Frederick Jackson (together, the guarantors):

> jointly and severally, * * * absolutely, unconditionally, and irrevocably, as a primary obligor, guaranty to * * * [the bank] * * * full and prompt payment when and as due * * * of all of the obligations of * * * [the corporation] to * * * [the bank], plus interest and costs and expenses of collection * * * all without * * * [the bank] first having to proceed against * * * [the corporation] or otherwise enforce, or commence to enforce, payment thereof. The Indebtedness guarantied herein shall extend to and include all past, present and future obligations of any nature, without limit or exception, of * * * [the corporation] to * * * [the bank].

The guaranty agreement has a space to set forth the security granted by the guarantors for the bank's guaranty. That space is blank. The guaranty agreement in evidence is one page in length. It states that 10 paragraphs of the agreement appear on "the revise [sic] side" of the page. Such reverse side is not in evidence.

The Note

By a document entitled "Commercial Promissory Note" (the note), dated November 21, 1995, the bank agreed to lend the corporation $765,000. Among other things, the note provides that its term is 5 years, the interest rate is 8.25 percent, both

interest and principal will be paid over the term of the note, and the purpose of the note is to buy a warehouse. The note is secured by a mortgage. The note is signed on behalf of the corporation by "R.L. McKale", "President". Petitioner and his father guaranteed the note.

Testimony of Vice Chairman of Bank

William Sunderland is the vice chairman of the bank. He is an officer of the bank who approved the bank's participation in the loan agreement and the note (together, the loans). He testified, and we find, as follows:

The bank followed its ordinary practices in making the loans. Among other things, it considered the assets, debts, and liabilities of the corporation.

In evaluating the loan, the bank believed the corporation's financial statements to show a negative net worth of $80,072 and the guarantors' financial statements to show a positive net worth of $5,534,455. The value of the mortgaged property had been established by appraisal to be $1,240,000, which, when compared with the amount of the loan, $1.2 million, established a loan-to-value percentage of 96.7 percent. That percentage exceeded the bank's supervisory limit. The bank had a loan policy, and making the loan deviated from that policy. The bank made the loan based not only on the value of the collateral securing the loan but

also on the basis of the guaranty. The bank made the loan evidenced by the note for substantially the same reasons.

The net worth of the guarantors was not a sufficient condition for the bank to deviate from its loan policy and make the loans. To deviate from its loan policy and make the loans, it was also necessary that it appear to the bank that the enterprise of the corporation was going to be successful. At the time the loans were made, the bank believed that the corporation had the potential to make repayment.

The bank normally asks principals to guaranty corporate debt.

For repayment of the loans, the bank would look, first, to the corporation, and, second, to the guarantors. If the corporation defaulted on the loans, the bank would immediately attempt to establish an interest in the inventory and other nonreal property assets of the corporation. It would then pursue its rights under the mortgage, and, finally, it would look to the guarantors.

The bank (located in Michigan) does not normally make loans to Florida corporations or loans secured by Florida real estate. The fact that petitioner's father was chief financial officer for a company that was both a large employer in the bank's home area and a large customer played a role in the bank's decision to make the loans.

The corporation has not defaulted on the loans.

The Guarantors

Petitioner's father testified that he agreed to act as guarantor:  "To expedite the loan and, hopefully, get a little lower interest rate."  Petitioner's father was not a shareholder, officer, or employee of the corporation.

Petitioners' Returns

On petitioners' Federal income tax returns for 1994 through 1996, petitioners claimed losses from the corporation of $39,621.25, $44,390.02, and $53,188.25, respectively.  For 1994, petitioners claimed a net operating loss carryforward of $743.62 (the carryforward), which resulted from losses of the corporation for 1993 and prior years (both such carryforward and the losses from the corporation for 1994 through 1996 being referred to as "the losses").

The Notice

The adjustments giving rise to the deficiencies in tax here in question are respondent's disallowance of any deductions for the losses.[1]  Respondent's grounds for such adjustments are that,

---

[1]  Inexplicably, respondent's disallowance for 1995 is in the amount of $42,564, which is $1,825.02 less than the loss claimed by petitioners ($44,390.02).  We shall sustain respondent's determination of a deficiency with respect to 1995 only to the extent attributable to respondent's disallowance, in the amount of $42,564.

for the years in question, petitioner's adjusted basis in his shares of stock of the corporation was zero.

OPINION

## I.  Introduction

We must determine whether petitioner may deduct his pro rata share of certain losses of the corporation, an S corporation. The parties agree that the answer to that question turns on whether petitioner had more than a zero adjusted basis in his shares of the corporation (the shares). Petitioners' only argument for an adjusted basis in excess of zero is that, on account of the guaranty, petitioner should be viewed as having made a capital contribution to the corporation.

## II.  Provisions of the Code

In pertinent part, section 1366(a) provides that a shareholder of an S corporation may deduct his pro rata share of the S corporation's loss, subject to the limitations contained in section 1366(d)(1).

Section 1366(d)(1) provides:

Cannot Exceed Shareholder's Basis in Stock and Debt. --The aggregate amount of losses and deductions taken into account by a shareholder under subsection (a) for any taxable year shall not exceed the sum of--

(A) the adjusted basis of the shareholder's stock in the S corporation * * *, and

(B) the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder * * *

In pertinent part, section 1011 provides that the adjusted basis of property shall be the basis of such property determined under section 1012.

In pertinent part, section 1012 provides that the basis of property shall be the cost of such property.

III.  Arguments of the Parties

Petitioners argue:  "The application of traditional debt-equity principles results in the characterization of Petitioner-husband's loan guarantees as a capital contribution to his Corporation."  Petitioners rely, in particular, on two cases: Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), and Selfe v. United States, 778 F.2d 769 (11th Cir. 1985).

In Plantation Patterns, the Court of Appeals for the Fifth Circuit determined that, because of the meager capital position of the nominal borrower corporation (a C corporation), lenders to that corporation were relying on the indirect shareholder's guaranty of the corporate debt to give borrowing power to the corporation.  See Plantation Patterns, Inc. v. Commissioner, supra at 722-723.  Since the nominal borrower corporation lacked borrowing power, the Court of Appeals determined that the indirect shareholder was the real borrower, with the guaranty simply amounting to a covert way for him to put his money "at the risk of the business".  Id.

In <u>Selfe</u>, the Court of Appeals for the Eleventh Circuit concluded that "under the principles of <u>Plantation Patterns</u>, a shareholder who has guaranteed a loan to a Subchapter S corporation may increase her basis [in her stock in the S corporation] where the facts demonstrate that, in substance, the shareholder has borrowed funds and subsequently advanced them to her corporation."[2]  <u>Selfe v. United States</u>, <u>supra</u> at 773.

On brief respondent argues that petitioner has made no capital contribution to the corporation since petitioner has made no "actual economic outlay":

> It is a well established principle that a shareholder who guarantees the debt of a subchapter S corporation is not entitled to an increase in basis by the amount of the guaranteed loan. <u>Goatcher v. United States</u>, 944 F.2d 747 (10th Cir. 1991); <u>Underwood v. Commissioner</u>, 63 T.C. 468 (1975).  Courts in almost every case that have dealt with this issue, have held that a shareholder who guarantees a debt of a subchapter S corporation must sustain some economic outlay.  Absent an economic outlay a shareholder is not entitled to an increase in basis.  <u>Estate of Leavitt v. Commissioner</u>, 90 T.C. 206 (1988).

IV.  <u>Discussion</u>

A.  <u>Introduction</u>

It is often necessary to determine whether a particular interest in a corporation is to be treated for Federal income tax

---

[2]  The Court of Appeals for the Eleventh Circuit treated <u>Plantation Patterns, Inc. v. Commissioner</u>, 462 F.2d 712 (5th Cir. 1972), as precedential, based on <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (Court of Appeals for the Eleventh Circuit adopted as precedent decisions of the Court of Appeals for the Fifth Circuit rendered prior to Oct. 1, 1981).

purposes as stock (equity) or indebtedness.  Because the Internal

Revenue Code contains no controlling definitions, that

determination generally is made with reference to various factors

that indicate the economic substance of a transaction.  See,

e.g., section 385(b), which sets forth five factors that may be

included in any regulations prescribed by the Secretary to

determine, with respect to a particular factual situation,

whether a debtor-creditor relationship exists or a corporation-

shareholder relationship exits.[3]  See also <u>Selfe v. United

States</u>, <u>supra</u> at 773, setting forth the 13 factors that the Court

of Appeals for the Eleventh Circuit applies to characterize a

taxpayer's interest in a corporation[4].  Petitioners ask us to

---

[3]  Those factors are:

   (1) whether there is a written unconditional promise
to pay on demand or on a specified date a sum certain
in money in return for an adequate consideration in
money or money's worth, and to pay a fixed rate of
interest,

   (2) whether there is subordination to or preference
over any indebtedness of the corporation,

   (3) the ratio of debt to equity of the corporation,

   (4) whether there is convertibility into the stock of
the corporation, and

   (5) the relationship between holdings of stock in the
corporation and holdings of the interest in question.

[4]  The following are the 13 factors set forth by the Court
of Appeals in <u>Selfe v. United States</u>, 778 F.2d 769, 773 n.9 (11th
Cir. 1985):

(continued...)

apply such factors ("traditional debt-equity principles") to the situation before us in order to conclude that petitioner contributed almost $2 million to the capital of the corporation.

Specifically, petitioners ask us to find that (1) the corporation had no capacity to borrow the sums here received from the bank, (2) the bank relied on the guarantors' credit-worthiness and, in fact, lent such sums to the guarantors,

---

[4](...continued)
(1)  the names given to the certificates evidencing the indebtedness;

(2)  the presence or absence of a fixed maturity date;

(3)  the source of payments;

(4)  the right to enforce payment of principal and interest;

(5)  participation in management flowing as a result;

(6)  the status of the contribution in relation to regular corporate creditors;

(7)  the intent of the parties;

(8)  'thin' or adequate capitalization;

(9)  identity of interest between creditor and stockholder;

(10) source of interest payment;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

(3) the guarantors contributed such sums to the capital of the corporation, and (4) such contribution by petitioner resulted in an increase in petitioner's adjusted basis in his stock under section 1012.[5]  Therefore, argue petitioners, petitioner had an adequate basis under section 1366(d)(1)(A) to allow him to deduct the losses.  Petitioners specifically disclaim that they are asking us to find that the guaranty increased any indebtedness of the corporation to petitioner (which would bring into operation section 1366(d)(1)(B)).

---

[5]  Petitioners do not cite, but apparently rely on, sec. 1.118-1, Income Tax Regs., to establish a cost basis in petitioner's shares on account of such deemed capital contribution.  In pertinent part, sec. 1.118-1, Income Tax Regs., provides:

> Contributions to the capital of a corporation.--* * * if a corporation requires additional funds for conducting its business and obtains such funds through voluntary pro rata payments by its shareholders, the amounts so received being credited to its surplus account or to a special account, such amounts do not constitute income, although there is no increase in the outstanding shares of stock of the corporation.  In such a case the payments are in the nature of assessments upon, and represent an additional price paid for, the shares of stock held by the individual shareholders, and will be treated as an addition to and as a part of the operating capital of the company. * * *  [Emphasis added.]

B.  Debt-Equity Analysis

Clearly, the loan agreement and the note, both in form and substance, constitute debt and not equity.  The question here is not whether the bank was a lender, which it surely was, but to whom did it lend approximately $2 million, the corporation or the guarantors.  Apparently, petitioners wish us to consider certain of the debt-equity factors (e.g., the adequacy of capitalization of the corporation) to determine that, but for the guaranty, the bank would not, on any terms, have made the loans to the corporation.  Because the bank undoubtedly lent almost $2 million to someone, petitioner would use the hoped for results of our debt-equity analysis to convince us that the loan must have been to the guarantors, the only other possibility in sight.

Petitioners' argument is not illogical.  Nevertheless, courts, including this Court and the Court of Appeals for the Eleventh Circuit (to which any appeal of our decision likely would lie), have been hesitant to substitute the guarantor for the nominal borrower as the borrower-in-substance.  Indeed, this Court has stated:  "We decline to apply the debt-equity analysis used in Plantation Patterns to the guaranty of a loan to a subchapter S corporation."  Estate of Leavitt v. Commissioner, 90 T.C. 206, 216 (1988), affd. 875 F.2d 420 (4th Cir. 1989).

Petitioners ask us to reconsider that position.  In <u>Selfe v.</u>
<u>United States</u>, 778 F.2d at 774, the Court of Appeals for the
Eleventh Circuit, recognized:  "That taxpayers rarely, if ever,
have demonstrated that a guarantee was in reality a loan to the
corporation from the shareholder/taxpayer".  Nevertheless, the
Court of Appeals held:  "Under the principles of <u>Plantation</u>
<u>Patterns</u>, a shareholder guarantee of a loan may be treated for
tax purposes as an equity investment in the corporation where the
lender looks to the shareholder as the primary obligor." <u>Id.</u>  In
<u>Plantation Patterns v. Commissioner</u>, 462 F.2d at 722-723, the
Court of Appeals for the Fifth Circuit concluded that the
relevant inquiry is whether the guaranty enabled the guarantor to
create borrowing power for the corporation.  The relevant point
of inquiry, stated the Court of Appeals, is at the inception of
the guaranty, and the relevant question is whether, at that time,
"there was a reasonable expectation that the business would
succeed on its own." <u>Id.</u> at 723.  See also <u>Santa Anita Consol.,</u>
<u>Inc. v. Commissioner</u>, 50 T.C. 536 (1968), in which we said that
the real differences between a guaranteed loan and a loan to the
guarantor "lie in the debt-creating intention of the parties, and
the genuineness of repayment prospects in the light of economic
realities." <u>Id.</u> at 552 (quoting <u>American Processing & Sales Co.</u>
<u>v. United States</u>, 178 Ct. Cl. 353, 371 F.2d 842, 857 (1967)
(internal quotation marks omitted)).

C.  Discussion

To persuade us that the corporation lacked borrowing power, petitioners' claim:  "The Corporation was undercapitalized, the loans were utilized exclusively to purchase capital assets and the corporation did not have the capacity to repay the loans." Certainly, petitioners have addressed certain factors pertinent to debt-equity analysis.  Nevertheless, they have failed to persuade us that the intent of the parties to the loans was other than to create indebtedness of the corporation and that there were not genuine and realistic prospects of repayment by the corporation.  See Santa Anita Consol., Inc. v. Commissioner, supra.

If intent is to be divined from actions, then the actions of the parties to the loans unequivocally signify the intent to create an indebtedness of the corporation.  The loan agreement, note, and mortgage all appear to be standard, form documents intended to create, or secure, indebtedness of the named borrower, viz, the corporation.  The guaranty agreement also appears to be a standard, form document.  The parties have stipulated that petitioner and his father were guarantors of the loan agreement.  The language in the guaranty agreement that petitioner, "as a primary obligor", guarantees the corporation's obligations, may have been intended to create in petitioner (and his father) joint and several liability with the corporation for

repayment of the loan.  See Restatement 3d, Suretyship and Guaranty, sec. 15 (1996) (Restatement).  Nevertheless, petitioner's guarantor (suretyship) status indicates that, as between the corporation and the petitioner, it is the corporation which ought to perform the underlying obligation or bear the cost of performance.  See Restatement, sec. 1(c); 28 Fla. Jur. 2d Guaranty and Suretyship, sec. 1 (1988).  The guaranty agreement does not alter our conclusion that the parties to the loans intended to create indebtedness in the corporation, and we so find.  Indeed, the loan agreement specifically prohibits the assumption of the resulting indebtedness "unless required by law."

Nevertheless, petitioners argue, there was no indebtedness of the corporation because the corporation was thinly capitalized, the proceeds of the loans were used to purchase capital assets, and the corporation had no capacity to repay the loans.  We grant the first two claims.  Petitioner has failed to prove the third.  Petitioner has offered no economic analysis leading to the conclusion that, at the time of the loans, the business of the corporation would not generate sufficient cash to pay off the loans.  Moreover, the loans were to be used to construct productive resources and were secured by those resources.  Mr. Sunderland, vice chairman of the bank, testified as follows:  The guarantees, although a necessary condition for

the bank to make the loans, were not a sufficient condition.  For the bank to deviate from its loan policy and make the loans, it had to appear to the bank that the enterprise of the corporation was going to be successful.  At the time the loans were made, the bank believed that the corporation had the potential to make repayment.

Thin capitalization and the use of debt proceeds to acquire essential assets are factors to be considered in the debt-equity analysis.  Alone, or together, however, they are not necessarily determinative that the corporation had no capacity to raise funds by borrowing.  See, e.g., Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).  Neither is it necessarily true that guaranteed indebtedness signifies an equity investment.  See, e.g., Santa Anita Consol., Inc. v. Commissioner, supra at 553.  By reducing the lender's risk, the guaranty may have secured the borrower a lower rate or a longer term (or both).  Petitioner's father testified that he agreed to act as guarantor: "To expedite the loan and hopefully, get a little lower interest rate."  Indeed, Mr. Sunderland testified that the bank normally asks principals to guarantee corporate debt.

Petitioners have failed to prove that the corporation had no capacity to repay the loans.  They have failed to prove that there were not genuine and realistic prospects of repayment by the corporation.  They have failed to prove that the bank looked

to the guarantors as the primary obligors on the loans. We find that the loans were to the corporation.

D. Conclusion

Petitioner did not, on account of the loans, make a capital contribution to the corporation. Therefore, petitioner has failed to prove that his basis in the shares exceeded zero.

V. Conclusion

For the years in issue, petitioner may not deduct his pro rata share of the losses of the corporation. Therefore, except as explained supra note 1, we sustain respondent's determination of deficiencies.

Decision will be entered under Rule 155.